POSTAL TELEGRAPH CABLE COMPANY OF MASSACHUSETTS
*vs.* CITY OF CHICOPEE.

Suffolk.   November 28, 1910. — January 4, 1911.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, & SHELDON, JJ.

*Telegraph Company.   Wires.   Constitutional Law,* Interstate commerce, Police
power.   *Municipal Corporations,* By-laws and ordinances.   *Way,* Public.
*Chicopee.   Equity Jurisdiction.*

Chapter 17 of the ordinances of the city of Chicopee of 1891 provided among other things that the mayor and aldermen should have exclusive power to license the erection and maintenance of telegraph and other lines of electric wires within the city, and that any license granted pursuant to the ordinance should be subject to the right of the city, free of charge, to place its fire alarm, telegraph or other electric wires upon the poles so licensed to be maintained.  An inspector of wires of the city also was provided for in the ordinance.  In 1891, a telegraph company, which applied for permission to erect poles and maintain wires on certain public ways in the city, was allowed such permission only subject to the requirements of the ordinance and to an agreement to save the city harmless from loss, cost or damage resulting from the erection or maintenance of the poles or wires, and accordingly it erected its poles and wires and the city placed thereon the wires of its fire alarm system, and in 1906 the wires for its municipal electric light system, over some of which was carried an alternating current of high tension.  In a suit in equity by the telegraph company to enjoin the city from maintaining electric wires upon the plaintiff's poles, a master, to whom the case was referred, found that the additional expense to the plaintiff caused by the presence of the defendant's wires was very small, as also was the cost to the defendant of inspection, that while the presence of the city's high tension wires upon the plaintiff's poles made it more dangerous for persons to go upon the poles, no accidents had happened because of that fact, and that, while high tension alternating currents close to the plaintiff's wires would cause induction, the defendant's wires had had no appreciable effect upon the plaintiff's business.  *Held,* that both in its purposes and in its application the ordinance of the city was reasonable and proper and was within the authority given to cities by R. L. c. 25, § 54; c. 26, §§ 2, 6, to regulate the erection and maintenance of wires for the transmission of electricity within their boundaries.

A police regulation of a State, affecting interstate commerce only indirectly, in a field which has not been occupied by congressional legislation, is not a regulation of such commerce within the implied prohibition of the Constitution of the United States.

Chapter 17 of the ordinances of the city of Chicopee of 1891 provided among other things that the mayor and aldermen should have exclusive power to license the erection and maintenance of telegraph and other lines of electric wires within the city, and that any license granted pursuant to the ordinance should be subject to the right of the city, free of charge, to place its fire alarm, telegraph or other electric wires upon the poles so licensed to be maintained. An inspector of wires of the city also was provided for in the ordinance. A telegraph company, which had received a permit from the city to place its poles and wires in certain public ways in the city, which were post roads, which permission was made provisional upon observance of the requirements of the ordinance and upon an agreement by the company to save the city harmless from loss, cost or damage resulting from the erection or maintenance of the poles and wires, allowed the city to place upon the poles the wires of its fire alarm system and of its municipal lighting plant. Very little expense or inconvenience resulted to the company therefrom. *Held*, that all that was done by the city under the ordinance had but a slight and incidental effect upon interstate commerce, through the imposition of a local regulation of the use of the streets for the purpose, primarily and principally, of preventing the erection of unnecessary and objectionable poles to the obstruction of travel, and, secondarily, to provide compensation to the city for the expense of inspecting the line of telegraph for the protection of the public; and that therefore neither the ordinance nor the acts of the city were in violation of the implied prohibition of the Constitution of the United States against interference with interstate commerce.

An ordinance of a city entitled "Electric Wires," which regulated the erection and maintenance of poles and electric wires in the public highways, contained a provision that the city, upon granting permission to any person or corporation to erect poles and maintain wires, should have the right to license the location of lines by any other person or corporation upon such poles upon payment being made to the corporation owning the poles of a reasonable compensation, but that the city should be permitted to place electric wires for its uses upon the poles free of charge. A company received and accepted a permit from the city in 1891, which was made subject to the ordinance called "Electric Wires," but which referred to it by the wrong number. Wires of the city, used in its electric fire alarm and its municipal lighting systems, without objection by the companies were maintained on the poles of the company and of several successors to its rights until 1908 when the then operating company sought by a bill in equity to enjoin the city from maintaining any wires upon its poles. It appeared from a report of a master to whom the suit was referred, that to compel the city to take its wires from the plaintiff's poles and to erect new poles for them would involve a large expenditure of money and would result in overcrowding the streets with poles. This court, without determining whether the ordinance, in making the provision as to permitting the city to use the poles free of charge while other companies licensed by the city might use them upon making compensation, went too far, *intimated* that, even if because of such provision in the ordinance the maintenance of the city's wires upon the plaintiff's poles was a technical invasion of the plaintiff's right, that right, under the circumstances of the long apparent acquiescence by the plaintiff and its predecessors in the use of the poles by the city and of the expense and overcrowding of the streets with poles which would be involved in causing the removal of the city's wires, could not be enforced by injunction in equity, but only by seeking damages in an action at law.

KNOWLTON, C. J.  This is a bill in equity * to enjoin the defendant from maintaining certain electric wires upon the plaintiff's telegraph poles.  In 1891 the Postal Telegraph Cable Company of New York erected a telegraph line in the city of Chicopee from the line of the city of Springfield on the south, by a somewhat circuitous route, through Chicopee Centre to Chicopee Falls, and thence northwesterly to the line of the city of Holyoke, this being a part of a telegraphic system extending into and through other States, which was used in part in interstate commerce.  By a series of conveyances through different corporations this line has passed into the ownership of the plaintiff, which holds it, with all the rights, and subject to all the liabilities of the original owner.  It runs through public highways which are post roads.  The plaintiff's predecessor in title had a right to construct and maintain such a line, and the plaintiff has a right to maintain it along public highways, under the U. S. Rev. Sts. § 5263.  This right also is reaffirmed and extended to other classes of corporations by the R. L. c. 122, § 1.  But it is subject to the right of cities and towns to make any reasonable local regulations in regard to the exercise of it.  R. L. c. 25, § 54; c. 26, §§ 2, 6.  These regulations, under the Constitution of the United States, must be such as do not interfere with or regulate directly interstate commerce.  These propositions are all well established by decisions of the Supreme Court of the United States.

On June 15, 1891, the plaintiff's predecessor in title, acting in accordance with the R. L. c. 122, §§ 1, 2, applied to the mayor and aldermen for authority in writing, fixing the location of its line and establishing its rights.  In July, 1891, the city of Chicopee passed an ordinance, which is chapter seventeen of the ordinances of that year, and which provided that the mayor and aldermen should have the exclusive power to license the erection and maintenance of telegraph and telephone and other lines of electric wires within the city, and that any license granted

---

* The bill was filed in the Supreme Judicial Court on June 19, 1908, and on September 11, 1908, a substitute bill was filed by leave of court.  The suit was referred to Daniel B. Ruggles, Esquire, as master and, upon the filing of the master's report, was reserved by *Sheldon*, J., for determination by this court.

pursuant to the ordinance should be subject to the right of the city, free of charge, to place its fire alarm telegraph or other electric wires upon the poles or through the conduit so licensed to be maintained, and to the right of the city to license the location of lines by any other person or corporation upon said poles and through said conduit, upon payment being made of a reasonable compensation, to be determined by the parties, or, if they fail to agree, to be determined by the mayor.   There was also a requirement that all parties licensed to erect poles and fixtures and to maintain electric wires should give to the city an agreement in writing to save it harmless from all claims for damages, costs, expenses, charges or compensation, for or on account of the erection, maintenance or use of such poles, fixtures or wires.   It also provided for the appointment and term of office of an inspector of wires, and for many other things, with a view to the proper regulation of the business of maintaining and using electric wires within the city.

The committee on highways, to whom was referred the application of the Postal Telegraph Cable Company for a permit, reported on July 6, 1891, recommending the granting of the petition, with certain modifications, and that the company must agree to comply with the city ordinance entitled, " Electric Wires."   The ordinance was ordained at or about the same time.   On the day when the report was filed it was accepted, and the clerk was instructed to notify the petitioner that the petition would be granted upon compliance with the restrictions and agreements therein enumerated.   On September 7, two months later, an order was passed by the mayor and aldermen that permission be given the petitioner to erect its lines in the specified streets, " upon the following express conditions, a violation of any of which shall at the election of the board of aldermen operate as a forfeiture of the permission and rights herein granted, to wit :

" 1st.   That said company shall agree ,to comply with the requirements of chapter 22 of the Revised Ordinances of the city of Chicopee.

" 2d.   That said company shall use the poles now erected in said city on Broadway from the house of Charles T. Hendrick to the Overman Wheel Company's factories."

"4th. That the officers and members of the fire department may, in the event of a fire and whenever in connection therewith they deem it proper, cut the wires of said company and that if so cut, they shall be repaired at the expense of said company.

"5th. That said company shall, before any work or construction in said streets or highways is done, execute under seal a contract in the words following, all blanks being properly filled, and deliver the same to the city."

Then followed an agreement to indemnify the city from loss, cost or damage suffered by reason of the erection or maintenance of the poles or wires. This contract was signed by one of the officers of the company, but was never returned to the defendant. By a clerical error the chapter of the ordinance was referred to in this order as twenty-two, instead of seventeen, the number intended. Chapter twenty-two is an ordinance relative to public parks, and it makes no reference to locations, poles or wires. Nearly all of the line was built shortly after this location was granted, although about half a mile of it was constructed before the license was granted.

This was the first location granted in the city of Chicopee for the erection and maintenance of electric wires. Since then the city has granted four locations to the Holyoke Street Railway Company, one location to the United Electric Light Company of Springfield, two locations to the J. Stevens Arm and Tool Company, thirty-one locations to the New England Telephone and Telegraph Company, and one location to the Postal Telegraph Cable Company of New York. There are now ten miles of trolley lines in Chicopee, not including span wires and feed wires, about six miles of municipal fire alarm lines averaging two wires, and about thirty miles of poles of the New England Telephone and Telegraph Company, carrying, on the average, a large number of wires.

Beginning more than ten years ago and ending before April, 1908, the city put municipal electric light wires upon eighty-seven of the plaintiff's poles, making two hundred and twenty-three hitches in all, and put eighty hitches in all of municipal fire alarm wires on the poles of the plaintiff. Up to the end of that time all this was done without objection of the plaintiff or

its predecessors in title, and without any requirement or tender of payment for the benefit.   During this time the general officers of the plaintiff and its predecessors had no knowledge of this use of the poles, although the company's district foreman, whose duty it was to report anything going on along the lines of interest to the company, knew it and reported it to the circuit manager at Boston.   The master's report gives us the ordinance in full, together with an elaborate statement of conditions as to different lines of wires in different places, and other important facts, much in detail.

It is obvious that in framing the ordinance the city council attempted to make careful provision for the protection of the public, in view of the probability of a great increase in the number of applications for authority to transmit electricity for various purposes through the streets.   It is certain that careful regulation of the erection and maintenance of poles and wires in the streets of a city is necessary, in the public interest.   As cities grow compact, and the need of using many wires for the transmission of electricity for many different purposes, on closely built streets, becomes more urgent, relief from inconvenience and danger can only be had by the removal of overhead wires from the streets and by placing them in conduits underground.   Legislation for this purpose, applicable especially to great cities, has become common in different parts of the country.   By the running of lines of wire upon different sets of poles in a crowded city, the difficulty of extinguishing fire and preventing a conflagration is often greatly increased, as well as the danger and inconvenience in using the streets in the ordinary way, and the unsightliness of numerous poles and wires.   It was therefore reasonable and proper that the ordinance should forbid the unnecessary duplication of lines and of poles in public places.   This was done in the requirement that licenses might be granted by the mayor and aldermen to other companies to use the same poles by making reasonable compensation therefor.   This was nothing more than a regulation that, if two or more companies desired to run two lines of wires through a street, they might be required, if it could be done reasonably, to put them on the same line of poles, the two companies sharing the expense equitably. This was entirely reasonable.   To the same effect and for the

same purpose was the provision in the order granting the permit to the plaintiff's predecessor, that the company should " use the poles now erected in said city on Broadway from the house of Charles T. Hendrick to the Overman Wheel Company's factories." The plaintiff has made no objection to these regulations. The city's wires for a fire alarm telegraph and those for the municipal lighting which was undertaken several years later were also to be provided for, and if there had been a provision for pecuniary compensation by the city for the benefit that it might derive in this way, the reasons already referred to plainly would have been an ample justification for the requirement that the plaintiff's predecessor should allow the wires to be put upon its poles. The reason for this regulation in the ordinance plainly was to protect the interest of the public. That the plaintiff would be subjected to some slight burden and increased expense in the construction of its line, for the protection and convenience of the public in the use of the streets and in the preservation of their property, surely did not deprive the mayor and aldermen of the right to impose the requirement upon it as a regulation. The very idea of regulation involves, not only possible restriction in the exercise of rights and the use of property, but also possible expenditure in the public interest, to make one's property available or one's rights enjoyable in the best way. The rights and interests of the public and the individual must be considered alike, in making police regulations for the common good. Unless this burden is excessive, and plainly unreasonable in reference to the benefits to be derived from the imposition of it, the ordinance is not invalid by reason of the requirement that it makes of the plaintiff.

Does the fact that the city derives a benefit from it, for which it makes no direct payment, change the character of the provision? In framing the ordinance the city might well take into account the probable expense to be incurred for the inspection of the lines from time to time, to diminish the risk of accident, and the liability of the city for injuries suffered by travellers from an unsafe condition of the poles or wires. The mayor and aldermen properly could require a pecuniary payment by the telegraph company to meet this cost of inspection, and this risk of loss, to which the city would be subjected. This has been

directly decided, even when the payment required was in the form of a tax, if the amount was such that it did not appear to be a tax for revenue, but merely a compensation for the reasonably anticipated cost of protecting the public. *Western Union Telegraph Co.* v. *New Hope*, 187 U. S. 419. *St. Louis* v. *Western Union Telegraph Co.* 148 U. S. 92. *Atlantic & Pacific Telegraph Co.* v. *Philadelphia*, 190 U. S. 160. *Postal Telegraph Cable Co.* v. *Taylor*, 192 U. S. 64.

The burden of expense put upon the plaintiff and its predecessors is very small. The first company was obliged, for its own purposes, to erect poles for its wires. The plaintiff's line in the city of Chicopee consists of about two hundred and fifty poles, and five wires upon one six-pin cross-arm, attached to the top gain of each of these poles. The poles, as they are described by the master, would readily carry many more wires besides those belonging to the city, — probably many more than the plaintiff will ever have occasion to put upon them. The attachment of the city's wires has increased the expense to the plaintiff in only a trifling sum. Indeed, it is found that this increased expense did not attract the attention of the general officers of the company until more than ten years after a considerable part of it had been incurred, and then only when a letter had been written by the defendant's inspector of wires, demanding that a cross-arm on some of the poles be lowered one gain, to make a place for the city's wires. The master has found that the cost to the city of the inspection of the plaintiff's poles and wires is small. Probably it is smaller than was expected when the ordinance was adopted; but it is a real and constant expense every year. Very likely, in a series of years covering the life of a line of poles, this expense would be much more than the additional cost to the plaintiff of a bar on the poles for such wires as the city would want to put there. We are of opinion that the ordinance, in the parts in question was reasonable and proper, and so within the authority conferred ·by the R. L. c. 25, § 54, and c. 26, §§ 2, 6.

The plaintiff complains that, while a part of the defendant's electric lighting is done by the direct system, carrying a very light current of electricity, another part of it is done with an alternating current of high tension, and that the proximity of

wires carrying such a current increases the danger to persons making repairs upon its line, and is objectionable by reason of the effect of induction. The master has found that there is more danger and that more care is required in making repairs where wires of high tension are in close proximity than where there are none; but he also found that there had been no injury to the plaintiff's servants or to its property from this cause. It is obvious that this is a matter simply calling for proper care on the part of those who are engaged in the work, and that the care must be adapted to circumstances of greater danger. As bearing upon the questions involved, this does not seem to us a matter of much importance. It relates simply to the method of doing work which is done in every city and large town, and in which there is no inherent difficulty, if proper precautions are taken.

The master considered the subject of induction, and has found, in substance, that the inductive effect of nearby high-tension wires interferes with the efficient operation of a telegraph system, but that the defendant's wires have had no appreciable effect upon the plaintiff's business in this particular. In the first place, for the most part, these wires are not charged with electricity in the daytime. In the next place, to produce any serious interference with the plaintiff's business would require a longer line of parallel high-tension wires than exists in that city. It was not shown that there had been any specific instances of trouble on the plaintiff's line in Chicopee, caused by the proximity of high-tension wires, or that the increase of voltage on its system was due in any degree to inductive difficulties caused by the proximity of the defendant's wires. He did find, however, that, by reason of inductive disturbances over its entire system, the plaintiff had been compelled to increase its voltage on its system over that which was formerly sufficient for the operation of its lines. Of course he found that inductive disturbance from other lines did not depend at all upon the wires being upon the same poles, except so far as they might be in closer proximity than if attached to an independent line of poles. The possibility of detriment to the plaintiff from induction, by reason of having these wires on its poles instead of upon independent poles, seems to be of little consequence, as against

the importance of keeping the obstructions in the streets of the city as few as possible.

If these requirements of the ordinance were not unreasonable or invalid under the statutes of this Commonwealth, it follows almost necessarily that they were not an interference with interstate commerce. They were adopted in the exercise of the police power, in reference to a local matter of public importance, about which Congress had taken no action. In *Western Union Telegraph Co.* v. *Pendleton,* 122 U. S. 347, 359, it was said that, within the limitation that it does not encroach upon the free exercise of the powers vested in Congress by the Constitution, a State " may, undoubtedly, make all necessary provisions with respect to the buildings, poles, and wires of telegraph companies within its jurisdiction which the comfort and convenience of the community may require." A provision almost identical with that in the present case was upheld in *St. Louis* v. *Western Union Telegraph Co.* 148 U. S. 92, and was assumed to be reasonable on the rehearing of the case, in 149 U. S. 465, and in the opinion in *Western Union Telegraph Co.* v. *New Hope,* 187 U. S. 419. In the first of these cases an additional requirement of a money payment by the telegraph company to the city was upheld, on the ground that it was to be treated as rent for the " absolute, permanent and exclusive appropriation " of space in the streets. Assuming that the statutes of this Commonwealth do not authorize a city to claim rent of a telegraph company for the use of the streets as property, the principles involved in other branches of this decision and in other decisions of the same court seem to cover the present case. It is well established that a police regulation of a State, affecting interstate commerce only indirectly, in a field which has not been occupied by congressional legislation, is not a regulation of such commerce within the implied prohibition of the Constitution of the United States. *Mississippi Railroad Commission* v. *Illinois Central Railroad,* 203 U. S. 335, 346. *Lake Shore & Michigan Southern Railway* .v. *Ohio,* 173 U. S. 285, 298. All that has been done by the defendant, under this ordinance, seems to have but a slight and incidental effect upon interstate commerce, through the imposition of a local regulation of the use of the streets, for the purpose, primarily and principally, of preventing the erection of unnecessary

and objectionable poles to the obstruction of travel; and secondarily, to provide compensation for the expense to the city of inspecting the line of telegraph for the protection of the public.

If it were held that the ordinance goes too far in requiring the plaintiff to permit other companies, if licensed by the city, to use its poles upon making compensation, and the city to use them for public purposes without compensation, it does not follow that the plaintiff should have an injunction. The vote of the city upon the report of the committee, which was communicated to the plaintiff's representatives, referred to the ordinance as entitled " Electric Wires." Then the formal order, which referred to the ordinance by a wrong number, put the plaintiff on inquiry as to the contents of the ordinance. It is hardly possible that the plaintiff's representatives did not understand, in general, the conditions under which they were permitted to erect their poles. The use of these poles by the city under these circumstances, for more than ten years without objection or claim of compensation, will hardly permit the enforcement of the plaintiff's alleged equitable right against the defendant. There is much in the case to support the defendant's argument that there has been laches. If the highest officers of the company were ignorant of the facts, its agents, who were in charge of business of this kind, knew all about them.

If the existence of the defendant's wires upon the plaintiff's poles were a technical invasion of the plaintiff's right, we are of opinion, upon the facts of this case, that the relief granted should not be an injunction against the continuance of the wires upon the poles, thus compelling the erection of new poles and the attachment of the wires to them. The master has found that this change could not be made without a large expenditure of money. Moreover, it would involve a crowding of the streets with poles, which the mayor and aldermen have rightly been attempting to prevent. It appears that, at present, in one or two places, there are four or five poles in front of one house. The master finds that, if the change were made as the plaintiff desires, there would be at least two places where there would be four or five poles within a distance of seventy-five feet. It would be more equitable, if the plaintiff's right

were established, that its relief should be by compensation in damages.

But for reasons already stated, the entry will be,

*Bill dismissed.*

*G. P. Wardner*, for the plaintiff.
*L. White*, for the defendant.