# ST. LOUIS *v.* WESTERN UNION TELEGRAPH COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MISSOURI.

No. 94. Argued December 16, 1892. — Decided March 6, 1893.

In this case it appears by the bill of exceptions that there was an application at the close of the trial for an instruction that the plaintiff was entitled to judgment for the sum claimed, which was refused and exception taken, and this is *held* to present a question of law for the consideration of this court, although there were no special findings of fact.

When the trial court, in a case where some facts are agreed and there is oral testimony as to others, makes a ruling of law upon a point not affected by the oral testimony, this court may consider it notwithstanding the fact that there was only a general finding of facts.

A municipal charge for the use of the streets of the municipality by a telegraph company, erecting its poles therein, is not a privilege or license tax.

A telegraph company has no right, under the act of July 24, 1865, c. 230, 14 Stat. 221, to occupy the public streets of a city without compensation.

This case presents no question of estoppel.

Whether such tax is reasonable is a question for the court.

ON February 25, 1881, the city of St. Louis passed an ordinance, known as ordinance No. 11,604, authorizing any telegraph or telephone company duly incorporated according to law, doing business or desiring to do business in the city of St. Louis, to set its poles, pins, abutments, wires and other fixtures along and across any of the public roads, streets and alleys of the city, subject to certain prescribed regulations. Sections six, eight and nine read as follows:

" SEC. 6. Every telegraph or telephone company doing business in this city shall keep on deposit with the treasurer the sum of fifty dollars, subject to the order of the street commissioner, to be used by him in restoring any sidewalk, gutter, street or alley pavement displaced or injured in the erection, alteration or removal of any pole of such company, when said company refuses or fails to make such restoration to the satisfaction of such commissioner. Any company failing to make such deposit within thirty days after the passage of this ordinance, or within five days after commencing business, if a new company, or which shall fail to make good the amount when any portion of it has been expended as herein provided, within five days after notice so to do has been sent by the street commissioner, shall be deemed guilty of a misdemeanor and punished as hereinafter provided."

" SEC. 8. Any company erecting poles under the provision of this ordinance shall, before obtaining a permit therefor from the board of public improvements, file an agreement in the office of the city register permitting the city of St. Louis to occupy and use the top cross-arm of any pole erected, or which is now erected, for the use of said city for telegraph purposes free of charge.

" SEC. 9. Nothing contained in this ordinance shall be so construed as to in any manner affect the right of the city in the future to prescribe any other mode of conducting such wires over or under its thoroughfares."

On March 22, 1884, another ordinance, known as ordinance No. 12,733, was passed. This ordinance was entitled " An ordinance to amend ordinance number 11,604," etc., and

amended that ordinance by adding certain sections, of which section 11 reads as follows:

"SEC. 11. From and after the first day of July, 1884, all telegraph and telephone companies, which are not by ordinance taxed on their gross income for city purposes, shall pay to the city of St. Louis, for the privilege of using the streets, alleys and public places thereof, the sum of five dollars per annum for each and every telegraph or telephone pole erected or used by them in the streets, alleys and public places in said city."

This section continued in force and was incorporated into and became a part of an ordinance of the city, entitled "An ordinance in revision of the ordinances of the city of St. Louis, and to establish new ordinance provisions for the government of said city," approved April 12, 1887, and numbered 14,000, the section being in said revised ordinance known as section 671 of article 8 of chapter 15.

The Western Union Telegraph Company being one of the companies designated in section 671, not taxed on its gross income for city purposes, and failing to pay the sum of five dollars per annum for each telegraph pole, as required by said section, on April 7, 1888, there was filed in the office of the clerk of the Circuit Court of the city of St. Louis a petition, setting forth these various ordinances, alleging that the telegraph company had during the three years last past held, owned and used in the streets and public places of the city of St. Louis 1509 telegraph poles, and praying to recover the sum of $22,635 therefor. This suit was removed by the telegraph company to the United States Circuit Court for the Eastern District of Missouri, and on February 16, 1889, an amended answer was filed by the company, admitting its use of the streets of the city of St. Louis as charged, and that it was not taxed on its gross income for city purposes, but denying the validity of the said ordinance, and the authority of the city to pass it. It also set up as defences that it was a corporation chartered, created and organized under the laws of the State of New York; that it owned, controlled and used lines of telegraph in various parts of the United States, which con-

nected with its lines in the city of St. Louis; that on the 5th of June, 1867, it duly filed with the Postmaster General of the United States a written acceptance of the restrictions and obligations required by law under and in accordance with the act of Congress of the United States, approved July 24, 1866, entitled "An act to aid in the construction of telegraph lines and to secure to the government the use of the same for postal, military and other purposes," and that it had ever since been subject to and complied with the terms of such act; that the streets and public places of the city of St. Louis were established post roads of the United States, under and in pursuance of the laws of the United States, and of the authorized rules and regulations of the officers and departments of the United States, made, passed and adopted in pursuance of said laws; that it has constructed, operated and maintained its lines of telegraph in the city of St. Louis under and by virtue of the authority of said acts of Congress; that while the city of St. Louis claims compensation from the defendant in the sum of five dollars per annum on account of each and every telegraph pole in the streets, alleys and public places in the city, yet in fact the said sum so assessed and sought to be recovered from it is a privilege or license tax for the privilege of carrying on its business in the city of St. Louis; and that its assessment and attempted enforcement and collection are in violation of article I, section 8, paragraphs 3 and 7, of the Constitution of the United States.

The defendant also alleged that it had complied with all the terms of ordinance No. 11,604; and, further, that during the time set forth in the petition all its property within the city of St. Louis was assessed in pursuance of law for the purpose of taxation by the State and city, and that it had paid all taxes levied thereon; and, still further, that the ordinance set forth imposed upon defendant a burden and tax additional to the taxes regularly assessed upon the property of defendant, without any corresponding or special advantage to the defendant; and that, in so far as it attempted to exact five dollars per annum for each pole, it was unreasonable, unjust, oppressive and void. The case was tried by the court

without a jury, and on June 17, 1889, a judgment was entered in favor of the defendant, the court holding that the burden imposed was a tax, and imposed in such form that it could only be regarded as a privilege or license tax, which the city had no authority to impose. 39 Fed. Rep. 59. To reverse such judgment, the city sued out a writ of error from this court.

*Mr. W. C. Marshall* for plaintiff in error.

*Mr. John F. Dillon*, (with whom was *Mr. Rush Taggart* on the brief,) and *Mr. Elenious Smith*, (with whom were *Mr. Charles W. Wells*, *Mr. Willard Brown* and *Mr. George H. Fearons* on the brief,) for defendant in error.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

At the threshold of the case we are met with the objection that there are no special findings of facts, and that, therefore, our inquiry is limited to questions arising upon the pleadings, or upon rulings made by the court during the progress of the trial. We have had occasion in a recent case, coming from the same court, to consider to what extent our inquiry may go in a case tried by the court without a jury, in which there are no special findings of facts, and it is, therefore, unnecessary to consider that question at length. *Lehnen* v. *Dickson*, *ante*, 71.

It is enough to say that in this case there was, as appears by the bill of exceptions, an application at the close of the trial for a declaration of law, that the plaintiff was entitled to judgment for the sum claimed, which instruction was refused, and exception taken; and this, as was held in *Norris* v. *Jackson*, 9 Wall. 125, presents a question of law for our consideration. Further, there was, as also appears in the bill of exceptions, an agreement as to certain facts, which though not technically such an agreed statement as is the equivalent of a special finding of facts, yet enables us to approach the consideration

of the declaration of law with a certainty as to the facts upon which it was based. It is true that, in addition to these agreed facts, there was some oral testimony, but as it appears from the opinion of the court that it made a distinct ruling upon a proposition of law not at all affected by the oral testimony, and which in its judgment was decisive of the case, we cannot avoid an inquiry into the matter thus determined. We, therefore, pass to a consideration of such questions as are distinctly presented and clearly involved.

And, first, with reference to the ruling that this charge was a privilege or license tax. To determine this question, we must refer to the language of the ordinance itself, and by that we find that the charge is imposed for the privilege of using the streets, alleys and public places, and is graduated by the amount of such use. Clearly, this is no privilege or license tax. The amount to be paid is not graduated by the amount of the business, nor is it a sum fixed for the privilege of doing business. It is more in the nature of a charge for the use of property belonging to the city — that which may properly be called rental. "A tax is a demand of sovereignty ; a toll is a demand of proprietorship." *State Freight Tax Case*, 15 Wall. 232, 278. If, instead of occupying the streets and public places with its telegraph poles, the company should do what it may rightfully do, purchase ground in the various blocks from private individuals, and to such ground remove its poles, the section would no longer have any application to it. That by it the city receives something which it may use as revenue, does not determine the character of the charge or make it a tax. The revenues of a municipality may come from rentals as legitimately and as properly as from taxes. Supposing the city of St. Louis should find its city hall too small for its purposes, or too far removed from the centre of business, and should purchase or build another more satisfactory in this respect; it would not thereafter be forced to let the old remain vacant or to immediately sell it, but might derive revenue by renting its various rooms. Would an ordinance fixing the price at which those rooms could be occupied be in any sense one imposing a tax? Nor is the character of

the charge changed by reason of the fact that it is not imposed upon such telegraph companies as by ordinance are taxed on their gross income for city purposes. In the illustration just made in respect to a city hall, suppose that the city, in its ordinance fixing a price for the use of rooms, should permit persons who pay a certain amount of taxes to occupy a portion of the building free of rent, that would not make the charge upon others for their use of rooms a tax. Whatever the reasons may have been for exempting certain classes of companies from this charge, such exemption does not change the character of the charge, or make that a tax which would otherwise be a matter of rental. Whether the city has power to collect rental for the use of streets and public places, or whether, if it has, the charge as here made is excessive, are questions entirely distinct. That this is not a tax upon the property of the corporation, or upon its business, or for the privilege of doing business, is thus disclosed by the very terms of the section. The city has attempted to make the telegraph company pay for appropriating to its own and sole use a part of the streets and public places of the city. It is seeking to collect rent. While we think that the Circuit Court erred in its conclusions as to the character of this charge, it does not follow therefrom that the judgment should be reversed, and a judgment entered in favor of the city. Other questions are presented which compel examination.

Has the city a right to charge this defendant for the use of its streets and public places? And here, first, it may be well to consider the nature of the use which is made by the defendant of the streets, and the general power of the public to exact compensation for the use of streets and roads. The use which the defendant makes of the streets is an exclusive and permanent one, and not one temporary, shifting and in common with the general public. The ordinary traveller, whether on foot or in a vehicle, passes to and fro along the streets, and his use and occupation thereof are temporary and shifting. The space he occupies one moment he abandons the next to be occupied by any other traveller. This use is common to all members of the public, and it is a use open equally to citizens

of other States with those of the State in which the street is situate. But the use made by the telegraph company is, in respect to so much of the space as it occupies with its poles, permanent and exclusive. It as effectually and permanently dispossesses the general public as if it had destroyed that amount of ground. Whatever benefit the public may receive in the way of transportation of messages, that space is, so far as respects its actual use for purposes of a highway and personal travel, wholly lost to the public. By sufficient multiplication of telegraph and telephone companies the whole space of the highway might be occupied, and that which was designed for general use for purposes of travel entirely appropriated to the separate use of companies and for the transportation of messages.

We do not mean to be understood as questioning the right of municipalities to permit such occupation of the streets by telegraph and telephone companies, nor is there involved here the question whether such use is a new servitude or burden placed upon the easement, entitling the adjacent lot owners to additional compensation. All that we desire or need to notice is the fact that this use is an absolute, permanent and exclusive appropriation of that space in the streets which is occupied by the telegraph poles. To that extent it is a use different in kind and extent from that enjoyed by the general public. Now, when there is this permanent and exclusive appropriation of a part of the highway, is there in the nature of things anything to inhibit the public from exacting rental for the space thus occupied? Obviously not. Suppose a municipality permits one to occupy space in a public park, for the erection of a booth in which to sell fruit and other articles; who would question the right of the city to charge for the use of the ground thus occupied, or call such charge a tax, or anything else except rental? So, in like manner, while permission to a telegraph company to occupy the streets is not technically a lease, and does not in terms create the relation of landlord and tenant, yet it is the giving of the exclusive use of real estate, for which the giver has a right to exact compensation, which is in the nature of rental. We do not understand it to be

questioned by counsel for the defendant that, under the constitution and laws of Missouri, the city of St. Louis has the full control of its streets, and in this respect represents the public in relation thereto.

It is claimed, however, by defendant, that under the act of Congress of July 24, 1866, c. 230, 14 Stat. 221, and by virtue of its written acceptance of the provisions, restrictions and obligations imposed by that act, it has a right to occupy the streets of St. Louis with its telegraph poles. The first section of that act contains the supposed grant of power. It reads: "That any telegraph company now organized, or which may hereafter be organized under the laws of any State in this Union, shall have the right to construct, maintain and operate lines of telegraph through and over any portion of the public domain of the United States, over and along any of the military or post roads of the United States which have been or may hereafter be declared such by act of Congress, and over, under or across the navigable streams or waters of the United States: *Provided*, That such lines of telegraph shall be so constructed and maintained as not to obstruct the navigation of such streams and waters, or interfere with the ordinary travel on such military or post roads." By sec. 3964, Rev. Stat. U. S.: "The following are established post roads: . . . All letter-carrier routes established in any city or town for the collection and delivery of mail matters." And the streets of St. Louis are such "letter-carrier routes." So also by the act of March 1, 1884, 23 Stat. 3: "All public roads and highways, while kept up and maintained as such, are hereby declared to be post routes."

It is a misconception, however, to suppose that the franchise or privilege granted by the act of 1866 carries with it the unrestricted right to appropriate the public property of a State. It is like any other franchise, to be exercised in subordination to public as to private rights. While a grant from one government may supersede and abridge franchises and rights held at the will of its grantor, it cannot abridge any property rights of a public character created by the authority of another sovereignty. No one would suppose that a fran-

chise from the Federal government to a corporation, State or national, to construct interstate roads or lines of travel, transportation or communication, would authorize it to enter upon the private property of an individual, and appropriate it without compensation. No matter how broad and comprehensive might be the terms in which the franchise was granted, it would be confessedly subordinate to the right of the individual not to be deprived of his property without just compensation. And the principle is the same when, under the grant of a franchise from the national government, a corporation assumes to enter upon property of a public nature belonging to a State. It would not be claimed, for instance, that under a franchise from Congress to construct and operate an interstate railroad the grantee thereof could enter upon the state-house grounds of the State, and construct its depot there, without paying the value of the property thus appropriated. Although the state-house grounds be property devoted to public uses, it is property devoted to the public uses of the State, and property whose ownership and control are in the State, and it is not within the competency of the national government to dispossess the State of such control and use, or appropriate the same to its own benefit, or the benefit of any of its corporations or grantees, without suitable compensation to the State. This rule extends to streets and highways; they are the public property of the State. While for purposes of travel and common use they are open to the citizens of every State alike, and no State can by its legislation deprive the citizens of another State of such common use, yet when an appropriation of any part of this public property to an exclusive use is sought, whether by a citizen or corporation of the same or another State, or a corporation of the national government, it is within the competency of the State, representing the sovereignty of that local public, to exact for its benefit compensation for this exclusive appropriation. It matters not for what that exclusive appropriation is taken, whether for steam railroads or street railroads, telegraphs or telephones, the State may if it chooses exact from the party or corporation given such exclusive use pecuniary compensation to the general pub-

lic for being deprived of the common use of the portion thus appropriated.

This is not the first time that an effort has been made to withdraw corporate property from state control, under and by virtue of this act of Congress. In *Western Union Telegraph Company* v. *Massachusetts*, 125 U. S. 530, the telegraph company set up that act as a defence against state taxation, but the defence was overruled. Mr. Justice Miller, on page 548, speaking for the court, used this language: " This, however, is merely a permissive statute, and there is no expression in it which implies that this permission to extend its lines along roads not built or owned by the United States, or over and under navigable streams, or over bridges not built or owned by the Federal government, carries with it any exemption from the ordinary burdens of taxation. While the State could not interfere by any specific statute to prevent a corporation from placing its lines along these post-roads, or stop the use of them after they were placed there, nevertheless the company receiving the benefit of the laws of the State for the protection of its property and its rights is liable to be taxed upon its real or personal property as any other person would be. It never could have been intended by the Congress of the United States in conferring upon a corporation of one State the authority to enter the territory of any other State and erect its poles and lines therein, to establish the proposition that such a company owed no obedience to the laws of the State into which it thus entered, and was under no obligation to pay its fair proportion of the taxes necessary to its support."

If it is, as there held, simply a permissive statute, and nothing in it which implies that the permission to extend its lines along roads not built or owned by the United States carries with it any exemption from the ordinary burdens of taxation, it may also be affirmed that it carries with it no exemption from the ordinary burdens which may be cast upon those who would appropriate to their exclusive use any portion of the public highways.

Again, it is said that by ordinance No. 11,604 the city con-

tracted with defendant to permit the erection of these poles in consideration of the right of the city to occupy and use the top cross-arm of any pole for its own telegraph purposes, free of charge; and in support of that proposition the case of *New Orleans* v. *Southern Telephone & Telegraph Co.*, 40 La. Ann. 41, is cited. But in that case it appeared that the telephone company had set its poles and constructed its lines under and by virtue of the grant made by the ordinance, and hence the conditions named therein were held part of the contract between the city and the telephone company, which the former was not at liberty to disregard. As stated in the opinion, page 45 : "Obviously, upon the clearest considerations of law and justice, the grant of authority to defendant when accepted and acted upon, became an irrevocable contract, and the city is powerless to set it aside or to interpolate new and more onerous considerations therein. Such has been the well-recognized doctrine of the authorities since the *Dartmouth College Case*, 4 Wheat. 518." The same principle controlled the cases of *Commonwealth* v. *New Bedford Bridge*, 2 Gray, 339; *Kansas City* v. *Corrigan*, 86 Missouri, 67; *Chicago* v. *Sheldon*, 9 Wall. 50.

But the difficulty of the application of that doctrine in this case is that there is nothing to show that a single pole was erected under or by virtue of ordinance No. 11,604. The only statement in the agreed facts is that they were erected prior to July 1, 1884. If we turn to the oral testimony, there is nothing tending to show that any were erected after the 25th of February, 1881, the date of the passage of ordinance No. 11,604. On the contrary, that testimony shows that the company had been engaged in the telegraph business in the city of St. Louis for 15 years or more prior to 1881. There is nothing, either, in the agreed facts, as to the use of the top cross-arm of any poles by the city of St. Louis, and the testimony tends to show that they were so used prior to 1881.

Whatever, therefore, of estoppel might arise if anything had been done by the telegraph company under the ordinance to change its position, as the case now stands none can be invoked, and all that can be said of the ordinance is that, in

its application to the facts as they appear, there is simply a temporary matter of street regulation, and one subject to change at the pleasure of the city. It is unnecessary, however, to consider these matters at length, for on a new trial the facts in respect thereto can be more fully developed. It is true that in cases tried by the court, where all the facts are specifically found or agreed to, it is within the power of this court, in reversing, to direct the judgment which shall be entered upon such findings. At the same time if for any reasons justice seems to require it, the court may simply reverse and direct a new trial. Indeed, this has been done, under special circumstances, in cases where there were no findings of facts or agreed statement, or where that which was presented was obviously defective. *Graham* v. *Bayne,* 18 How. 60; *Flanders* v. *Tweed,* 9 Wall. 425.

Another matter is discussed by counsel which calls for attention, and that is the proposition that the ordinance charging five dollars a pole per annum is unreasonable, unjust and excessive. Among other cases cited in support of that proposition is *Philadelphia* v. *Western Union Tel. Co.,* 40 Fed. Rep. 615, in which an ordinance similar in its terms was held unreasonable and void by the Circuit Court of the United States for the Eastern District of Pennsylvania. We think that question, like the last, may be passed for further investigation on the subsequent trial. *Prima facie,* an ordinance like that is reasonable. The court cannot assume that such a charge is excessive, and so excessive as to make the ordinance unreasonable and void; for, as applied in certain cases, a like charge for so much appropriation of the streets may be reasonable. If within a few blocks of Wall Street, New York, the telegraph company should place on the public streets 1500 of its large telegraph poles, it would seem as though no court could declare that five dollars a pole was an excessive annual rental for the ground so exclusively appropriated; while, on the other hand, a charge for a like number of poles in a small village, where space is abundant and land of little value, would be manifestly unreasonable, and might be so excessive as to be void. Indeed, it may be observed, in

the line of the thoughts heretofore expressed, that this charge is one in the nature of rental; that the occupation by this interstate commerce company of the streets cannot be denied by the city; that all that it can insist upon is, in this respect, reasonable compensation for the space in the streets thus exclusively appropriated; and it follows in the nature of things that it does not lie exclusively in its power to determine what is reasonable rental. The inquiry must be open in the courts, and it is an inquiry which must depend largely upon matters not apparent upon the face of the ordinance, but existing only in the actual state of affairs in the city.

We think that this is all that need be said in reference to the case as it now stands. For the reasons given, the judgment is

*Reversed and the case remanded for a new trial.*

Mr. Justice Brown dissenting.

The tax in this case cannot be considered, and does not purport to be a tax upon the property of the defendant. The gross disparity of the tax to the value of such property is of itself sufficient evidence of this fact — the total valuation of all of defendant's property in the city of St. Louis in 1884, as fixed by the state board of equalization, being but $17,064.63, while the tax of $5 upon 1509 poles amounted to $7545, or more than 44 per cent of the entire value of the property.

If it be treated as a tax upon the franchise then it is clearly invalid within the numerous decisions of this court, which deny the right of a State or municipality to impose a burden upon telegraph and other companies engaged in interstate commerce for the exercise of their franchises. *Leloup* v. *Mobile*, 127 U. S. 640; *Robbins* v. *Shelby Taxing District*, 120 U. S. 489; *Moran* v. *New Orleans*, 112 U. S. 69; *Harmon* v. *City of Chicago*, 147 U. S. 396; *Western Union Telegraph Co.* v. *Alabama*, 132 U. S. 472; *Pacific Express Co.* v. *Seibert*, 142 U. S. 339.

If this tax be sustainable at all it must be upon the theory adopted by the court that the municipality has the right to

tax the company for the use of its streets.   While I have no
doubt of its right to impose a reasonable tax for such use, the
tax must be such as to appear to have been laid *bona fide* for
that purpose.   It seems to me, however, that the imposition
of a tax of $5 upon every pole erected by the company
throughout the entire municipality is so excessive as to indi-
cate that it was imposed with a different object.   In the city
of St. Louis alone the tax amounts, as above stated, to $7545.
A similar tax in the city of Philadelphia amounted to $16,000,
while the facts showed that, at the most, only $3500 per year
was required to cover every expenditure the city was obliged
to make upon this account.   *Philadelphia* v. *W. U. Tel. Co.*,
40 Fed. Rep. 615.   A like tax imposed by every city through
which the defendant company carries its wires would result
practically in the destruction of its business.   While, as stated
in the opinion of the court, $5 per pole might not be excessive
if laid upon poles in the most thickly settled business section
of the city, the court will take judicial notice of the fact that
all the territory within the boundaries of our cities is not
densely populated, that such cities include large areas but
thinly inhabited, and that a tax which might be quite reason-
able if imposed upon a few poles would be grossly oppressive
if imposed upon every pole within the city.   In my opinion
the tax in question is unreasonable and excessive upon its face,
and should not be upheld.   The fact that it was nominally
imposed for the privilege of using the streets is not conclusive
as to the actual intent of the legislative body.   As was said
by this court in the *Passenger Cases*, 7 How. 283, 458 : "It is
a just and well-settled doctrine established by this court, that
a State cannot do that indirectly which she is forbidden by
the constitution to do directly.   If she cannot levy a duty or
tax from the master or owner of a vessel engaged in commerce
graduated on the tonnage or admeasurement of the vessel, she
cannot effect the same purpose by merely changing the ratio,
and graduating it on the number of masts, or of mariners, the
size and power of the steam engine, or the number of passen-
gers which she carries.   We have to deal with things, and we
cannot change them by changing their names."

The tax in question seems to me to indicate upon its face that it was not imposed *bona fide* for the privilege of using the streets, but was intended either as a tax upon the franchise of the company, or for the purpose of driving its wires beneath the ground. While the latter object may be a perfectly legitimate one, I consider it a misuse of the taxing power to seek to accomplish it in this way. I am, therefore, constrained to dissent from the opinion of the court.