TCG DETROIT, Plaintiff,

v.

CITY OF DEARBORN, Defendant and Third–Party Plaintiff,

v.

AMERITECH MICHIGAN, Third–Party Defendant.

No. 96–CV–74338–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 14, 1998.

Richard C. Marsh, Clark Hill, Detroit, MI, for TCG Detroit, a New York general partnership, Plaintiff & Counter–Defendant.

John W. Tanner, III, Debra C. Walling, Dearborn City Legal Department, Dearborn, MI, William Malone, Miller, Canfield, Washington, DC, for City of Dearborn, Defendant, Counter–Claimant & Third–Party Plaintiff.

William D. Parsley, Gary L. Field, Loomis, Ewert, Lansing, MI, for Telephone Association of Michigan, Movant.

Joseph A. Fink, Peter H. Ellsworth, Dickinson, Wright, Lansing, Bruce R. Byrd, Dickinson, Wright, Detroit, MI, for Ameritech Michigan, a successor of Michigan Bell Telephone, for Third–Party Defendant.

## MEMORANDUM OPINION AND ORDER

ZATKOFF, District Judge.

### I. INTRODUCTION

This matter is before the Court on cross-motions for summary judgment, filed by all of the parties, pursuant to Fed.R.Civ.P. 56. Responses and replies have been filed. The Court finds that the facts and legal arguments are adequately presented in the parties' briefs and the decisional process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. Local R. 7.1(e)(2), it is hereby ORDERED that the motions be resolved on the briefs submitted. For the reasons set forth below, Plaintiff's motion is denied and Defendant's motion is granted. Additionally, the Third-party Plaintiff's motion is denied and the Third-party Defendant's motion is granted.

### II. BACKGROUND

Plaintiff, TCG Detroit (hereinafter "TCG"), is a telecommunications provider licensed by the Michigan Public Service Commission to provide basic local telecommunications service in certain areas of Southeastern Michigan, including within the city limits of the Defendant, City of Dearborn (hereinafter "City" or "Dearborn"). TCG competes with Ameritech, the incumbent local exchange carrier.

TCG, although presenting owning no facilities in Dearborn's public right-of-ways, planned to construct, install and maintain facilities within the city limits of Dearborn. These facilities were to be constructed in electrical conduit in Detroit Edison's right-of-way. Pursuant to a contract entered into on February 17, 1994, between Detroit Edison and TCG, TCG agreed to install for Edison, fiber optic cable in Edison's inner duct, which resides within existing electrical conduit, in Dearborn's right-of-way. Pursuant to the contract, the fiber optic cable as installed by TCG would be owned by Edison but some of the fiber optic cable would be leased back to TCG for it to provide telecommunications services.

According to TCG, when Detroit Edison informed the City of Dearborn of this plan on February 24, 1994, Dearborn objected. It was, and is, Dearborn's position that TCG needed to enter into a franchise agreement before entering into the City's right-of-ways to install facilities providing telecommunications services. Thereafter, in the first quarter of 1995, Detroit Edison stopped the installation of cable by TCG within its conduit until the issue between the City of Dearborn and TCG was resolved. According to the TCG, at the time installation was stopped, approximately 7–8 miles of cables had been installed out of a planned 27 miles.

Dearborn and TCG had been negotiating to settle their dispute since mid–1994. At that time, Dearborn did not have an ordinance with respect to telecommunications. However, on August 16, 1994, while settlement negotiations were progressing, Dearborn did enact such an ordinance requiring telecommunications providers who wished to utilize the City's right-of-ways, to enter into a franchise agreement with the City (Plaintiff's Ex. I). Thereafter, the negotiations between the City and TCG culminated in a negotiated franchise agreement proposal offered by the City, to TCG, in June 29, 1995.

This proposed agreement required TCG to pay Dearborn a franchise fee of 4% of TCG's gross revenues, a $50,000 one time payment (in lieu of providing the City with four fiber optic strands), and up to $2500 of the costs incurred by the City of Dearborn in connec-

tion with granting the franchise. In addition, the proposal called for TCG, if it should ever install its own conduit within the City, to install an inner conduit for use by the City (City's Ex. 8). TCG's regional counsel responded by letter dated September 22, 1995, wherein he agreed with the substance of the proposal, while noting some minor changes (City's Ex. 10).

While these talks between the City and TCG were being conducted, Congress enacted the Federal Telecommunications Act (FTA), 47 U.S.C. § 253, effective February 6, 1998, which made significant changes to the telecommunications laws. Thus, Plaintiff, TCG, felt that this Act conflicted with the authority of the City to require the franchise agreement it sought to have TCG enter into. Accordingly, TCG rejected the franchise proposal which it had preliminarily negotiated with the City. After continuing talks were unsuccessful, TCG filed the present suit alleging that the City of Dearborn ordinance requiring telecommunications providers to enter into a franchise agreement is in violation of the Act. In addition, the Plaintiff claimed that the City's actions violated the Michigan Telecommunications Act, M.C.L. § 484.2251, as well. The Court struck the state claim, thus the only claims pending before the Court concerns the federal claims relating to the Federal Telecommunications Act.

Additionally, Plaintiff alleges that prior to the institution of this suit, the City of Dearborn was discriminating in favor of the incumbent local carrier, Ameritech, by not requiring it to enter into a franchise agreement. However, once TCG filed suit, Dearborn approached Ameritech about entering into a franchise agreement. Ameritech rejected that request and Dearborn filed a third-party action against Ameritech for refusing to enter into such an agreement. That claim is the subject of currently pending motions which will be addressed separately in this opinion infra. Nonetheless, this forms the basis of TCG's claim against the City of Dearborn that the City was discriminating against it by not requiring Ameritech, at least initially, to enter into a franchise agreement.

In addition, the Court notes that this is a case of first impression. The Sixth Circuit has not had an opportunity to address the issues before this Court, or the Federal Telecommunications Act of 1996 in general.

### III. STANDARD OF REVIEW

Summary judgment is appropriate only where no genuine issue of material fact remains to be decided and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). In applying this standard, "the Court must view all materials offered in support of a motion for summary judgment, as well as all pleadings, depositions, answers to interrogatories, and admissions properly on file in the light most favorable to the non-moving party." *Id.* 106 S.Ct. at 2510. Where "the moving party has carried its burden under 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### IV. OPINION

A. TCG v. City of Dearborn

Plaintiff, TCG, alleges that Dearborn's regulatory ordinance, and the way it is being applied to them, is in violation of the Federal Telecommunications Act of 1996. Specifically, TCG's suit alleges that the City of Dearborn's requirements are in violation of 47 U.S.C. § 253(a) (Count I) and 253(c) (Count II). In addition, Plaintiff brings a § 1983 claim as well (Count III). TCG requests, inter alia, that the Court declare the City of Dearborn's ordinance invalid, enjoin Dearborn from enforcing its ordinance, direct Dearborn to issue it a license, and award it damages, costs and attorney fees.

In Counts I and II of its complaint, TCG alleges that the City of Dearborn's ordinance, and the way it's applied, violates 47 U.S.C. § 253 on the grounds that: (1) the compensation is not fair and reasonable under the Act, (2) the City is not requiring compensation in a competitively neutral and nondiscriminatory manner, and (3) the City's ordinance is in violation of the Act because it has the effect of prohibiting Plaintiff's entry into the market. The statute at issue provides as follows:

(a) IN GENERAL

No State or local statute or regulation, or other State or local legal requirement, may prohibit, or have the effect or prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) STATE REGULATORY AUTHORITY

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) STATE AND LOCAL GOVERNMENT AUTHORITY

Nothing in this section affects the authority of a state or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of the public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253.

1. FAIR AND REASONABLE

■ Subsection (c) provides that local governments retain the authority "to require fair and reasonable compensation" from providers "for use of the public rights-of-way." Plaintiff argues that the compensation the City seeks to obtain from it is not "fair and reasonable."

Although "fair and reasonable compensation" is not defined by the Telecommunications Act, TCG contends that it should be given the same meaning as the term "just and reasonable" as used in the Pole Attachment Act, 47 U.S.C. § 224. Section 224 of the Pole Attachment Act, uses the specific language "just and reasonable" and defines that as:

[A] rate is just and reasonable if it assures a utility the recovery of not less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way.

Although the above definition is somewhat convoluted, it appears to limit "just and reasonable" under the Pole Attachment Act to the costs of the utility. Thus, TCG argues, because the term "just and reasonable" is comparable to the term "fair and reasonable compensation", the City of Dearborn should only be allowed to recover its reasonable costs relating to the installation of TCG's facilities. The Court disagrees.

First, the Pole Attachment Act relates to "attachment[s] by a cable television system", not to telecommunications providers. But more importantly, there is no apparent limitation of the kind the Pole Attachment Act uses in connection with "just and reasonable" and that used in the term "fair and reasonable compensation" as found in the Telecommunications Act, 47 U.S.C. § 253(c). And, as the Plaintiff recognizes, "it is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of its statutes, but omits it in another." *BFP v. Resolution Trust Corporation*, 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

Thus, Congress, if it had so chosen, could have defined "fair and reasonable compensation" the same as "just and reasonable" however, it did not do so. Accordingly, any comparison of the two terms is inapposite.

The two terms are facially inapposite, one refers to costs and the other refers to compensation for use of right-of-ways. Moreover, the fact that Congress used the word "compensation" in lieu of the word "costs" in the Telecommunications Act is strong evidence against construing the term to limit municipalities to strictly their costs related to telecommunications providers use of their right-of-ways.

■ The term "fair and reasonable compensation", although not explicitly defined by Congress, clearly enables a municipality to charge compensation for the use of its right-of-ways as the words "fair and reasonable" are commonly understood. Any determination of whether compensation is "fair and reasonable" is not amenable to a strict test. Rather, fair and reasonable is determined by examining the totality of the facts and circumstances. In this case, an examination of the relevant facts and circumstances indicates that the fees sought to be imposed by the City of Dearborn are fair and reasonable compensation under the circumstances.

■ First, there is nothing inappropriate with the city charging compensation, or "rent", for the City owned property that the Plaintiff seeks to appropriate for its private use. The statute specifically allows it. *See* 47 U.S.C. § 253(c)(this section does not affect the authority of the city to "require fair and reasonable compensation from telecommunications providers ... for use of the public rights-of-way...."). Moreover, the Supreme Court, in an opinion dealing with the placement of telegraph poles over a hundred years ago, recognized the general right of a city to seek compensation from a user of the city's land/right-of-way. As the Court stated:

[W]hen there is a permanent and exclusive appropriation of a part of the highway, is there in the nature of things anything to inhibit the public from exacting rental for the space thus occupied? Obviously not. Suppose a municipality permits one to occupy space in a public park, for the erection of a booth in which to sell fruit and other articles; who would question the right of the city to charge for the use of

the ground thus occupied, or call such a charge a tax, or anything else except rental? So, in like manner, while permission to a telegraph company to occupy the streets is not technically a lease, and does not in terms create the relation of landlord and tenant, yet it is the giving of the exclusive use of real estate, for which the giver has a right to exact compensation, which is in the nature of rental.

*City of St. Louis v. Western Union Tel. Co.,* 148 U.S. 92, 99, 13 S.Ct. 485, 488, 37 L.Ed. 380 (1893).

The Court went on to discuss whether the charge at issue was reasonable:

> Another matter is discussed by counsel which calls for attention, and that is the proposition that the ordinance charging five dollars a pole per annum is unreasonable, unjust, and excessive.... Prima facie, an ordinance like that is reasonable. The Court cannot assume that such a charge is excessive, and so excessive as to make the ordinance unreasonable and void....

*Id.* at 104, 13 S.Ct. 485.

Accordingly, when considering the amount of intended use in this case—TCG seeks to run approximately 27 miles of cable within the right-of-ways of the City of Dearborn—the compensation sought by the City is neither unfair nor unreasonable.[1]

Another relevant factor in determining whether the compensation is fair and reasonable is what other telecommunications providers would be willing to pay. In this case, three other telecommunications providers negotiated, and agreed to, franchise agreements substantially similar to that proposed to TCG. They include a franchise to Metropolitan Fiber Systems, Inc., requiring a 3% fee on gross revenue, costs of up to $2,500, the provision of four optic fibers for the use of the City, and conduit space for the City if the provider installed any conduit (Ex. 2). A franchise to Metrocom, Inc., called for a 3%

franchise fee on gross revenues, costs up to $2,500, and conduit if the provider chose to install it for itself. (Ex. 15). A franchise to MCI Metro Access Transmission Service, Inc., included a 5% fee on gross revenue or a per foot line charge, costs up to $2,700, and conduit space for the City if the provider choose to install any conduit (Ex. 14). These agreements with other providers were entered into on August 16, 1994, September 5, 1995, and October 17, 1995, respectively. In addition, each of the agreements contained other conditions related to insurance, liability, and the like.

Clearly, this is evidence in support of a finding that the compensation sought by the City is fair and reasonable. Certainly, the agreements that other providers are willing to enter into in order to utilize the City's right-of-ways are relevant in a determination of what is fair and reasonable. The evidence shows that at least three other providers agreed to franchises that involved a substantially the same terms and conditions as the City seeks to impose on TCG, including, a percentage fee on gross revenue, costs, and conduit space. This indicates that such conditions are neither unfair nor unreasonable.

Also relevant to a determination of whether or not the fees sought by the City are fair and reasonable are the dealings between the parties. Prior to the passage of the Federal Telecommunications Act, TCG and the City of Dearborn were in long term negotiations regarding the terms of a franchise agreement. The agreements of the other providers were before TCG and the City of Dearborn when they were negotiating an agreement in 1995. The last draft of that agreement, which the Plaintiff participated in negotiating, called for almost the exact same terms that TCG is objecting to now.

The proposed franchise agreement between TCG and Dearborn called for a franchise fee of 4% of TCG's gross revenue, a one

---

1. Plaintiff argues that the City of Dearborn cannot impose a "rental" fee because it is limited as to what it may charge pursuant to Michigan law. However, this case involves only the Federal Telecommunications Act, 47 U.S.C. § 253. The Court previously dismissed, without prejudice, the state law claim. Thus, to the extent that Plaintiff contends the City of Dearborn is exceeding its authority to impose fees and require compensation on state law grounds, such a claim is not before this Court and is more properly brought in state court.

time franchise fee of $50,000, and the requirement that if the Plaintiff installed conduit within the right of way, that they do so for City as well (City's Ex 8). This proposal was reached after extensive negotiations between the parties (Ex. 6–12). In fact, TCG negotiated for a one time $50,000 up front payment in lieu of providing fiber optic strands to the City (Ex. 6). In addition, from the extensive correspondence between the parties, it appears that TCG agreed to most, if not all of the terms (Ex. 11). Only after the passage of the Federal Telecommunication Act did the Plaintiff think it was no longer "fair and reasonable" to enter into such an agreement.

Thus, the evidence indicates that far from originally objecting to such a franchise agreement, TCG was actively negotiating the terms of the agreement which it now objects to. Therefore, to the extent that the Plaintiff now contends that the terms of its previously negotiated agreement are not "fair and reasonable compensation" for use of the right-of-ways, such a claim is belied by its apparent previous willingness to negotiate, and enter into, the agreement at issue. In fact, such evidence indicates quite the opposite, that the proposed agreement was reasonable, fair, and consistent.

Lastly, the Court is not convinced by Plaintiff's contention that the fees in the agreement that the City wishes to impose are so excessive that it is likely to render doing business unprofitable. TCG did not think such a franchise was unreasonable during negotiations, and neither did the other providers that actually entered into agreements. Although its clear that the Plaintiff would like to have access to the City's property without having to pay the City compensation, it is also clear that the simple fact that TCG does not want to pay the amount set by the City does not render that amount unreasonable or unfair under the Federal Telecommunications Act. After examining all of the circumstances listed above, the Court finds no genuine issue of material fact presented that the compensation sought by the City is either unfair, or unreasonable, as applied to this Plaintiff. Thus, the Court finds that the City's ordinance and the requirement that

TCG enter into a franchise agreement as discussed above, is not a violation of 47 U.S.C. § 253.

## 2. COMPETITIVELY NEUTRAL AND NON-DISCRIMINATORY

■ Plaintiff's next argument is that the City is not demanding compensation on a competitively neutral and nondiscriminatory basis. Section 253(c) requires that any compensation sought by the City be imposed in "competitively neutral and nondiscriminatory" manner. Plaintiff claims that the City of Dearborn is violating this provision by treating TCG differently from Ameritech.

Plaintiff argues that Ameritech enjoys free use of Dearborn's right-of-ways and that "prior to TCG bringing this lawsuit, no demand was made by Dearborn upon Ameritech that it enter into a franchise agreement . . . for its use of Dearborn's right-of-ways." However, since the lawsuit was filed, Dearborn has demanded that Ameritech enter into such an agreement. When Ameritech refused, the City of Dearborn filed a third-party complaint against Ameritech seeking to have Ameritech enter into a franchise agreement. Ameritech's position is that it has been granted a state-wide franchise to operate due to its incorporation under Act 129 of 1883. There are currently pending motions for summary judgment on those issues before the Court which will be addressed infra. However, regardless of the merits of Ameritech's position vis a vis the City of Dearborn, the fact remains that Dearborn *is* now seeking to require Ameritech to enter into an agreement. Therefore, to the extent TCG claims it is being discriminated against because the City has not sought to impose a franchise agreement on Ameritech, that claim is without merit as the City of Dearborn is suing Ameritech for that now.

TCG also claims as discriminatory Dearborn's apparent intention not to impose on Ameritech exactly the same agreement it wants TCG to enter into. In support of this proposition, TCG cites this portion of an interrogatory served on the City of Dearborn:

Q. Do you assert that Michigan Bell [Ameritech], and all other telecommunications

service providers operating in Dearborn, are required to enter into a franchise agreement with the City of Dearborn containing similar terms and conditions as the franchise agreement tendered by the City of Dearborn to TCG Detroit?

A. Yes; however, the City does not expect that each franchise agreement will be identical. Each agreement, at the time of execution, should reflect public needs and the providers' capabilities at the time, and the then-current market value, and/or maintenance costs for access to, and use of, the public right-of-way. Within the forgoing criteria, the aggregate comparative burdens on various competing providers need only be comparable, not equal.

(TCG Ex. V).

Based on that interrogatory answer, TCG argues that Dearborn's position is contrary to the clear language of § 253(c) which requires fair and reasonable compensable on a nondiscriminatory basis. Although of dubious ripeness, the Court will briefly address the TCG's argument.

TCG goes too far by equating the City's answer that the requirements will not be identical with the contention that it is unequal or discriminatory. TCG presents no evidence to the Court that the City must impose *exactly* the same agreement on each telecommunications provider without consideration of each providers size, contemplated use of the right-of-way, space available and the like. Moreover, the explicit language of the statute does not require such strict equality. All that is required is that the compensation sought be non-discriminatory and competitively neutral. 47 U.S.C. § 253(c). In fact, the position that TCG is advocating—exact parity—was specifically considered, and rejected, by Congress in drafting the Act.

During the drafting of the Act, Representative Dan Schaefer attempted to include a 'parity provision' in the Act. This parity provision would have required that any fees or charges imposed by a city, upon a telecommunications provider for use of the local right-of-ways, would have to have been exactly equal, regardless of the extent to which one provider needed to impose on the right-of-ways compared to another. 141 CONG. REC. H 8427 (August 4, 1995). This provision was flatly rejected by the Stupak–Barton amendment. In offering his amendment to replace the manager's amendment, which included the parity provision, Representative Stupak stated:

[L]ocal Governments must be able to distinguish between different telecommunications providers. The way the manager's amendment is right now, they cannot make that distinction.

For example, if a company plans to run 100 miles of trenching in our streets and wires to all parts of the cities, it imposes a different burden on the right-of-way than a company that just wants to string a wire across two streets to a couple of buildings.

The manager's amendment says that local governments would have to charge the same fee to every company regardless of how much or how little they use the right-of-way or rip up our streets.... [rather] the companies should have to pay a fair and reasonable rate to use the public property.

*Id.* at H 8460. The Stupak–Barton amendment was adopted in place of the parity provision. As can be clearly seen from Representative Stupak's comments, the parity provision was defeated because it did not allow a local government to distinguish between providers based on their varying use of the right-of-ways. Nothing in the debate of the Stupak–Barton amendment, which became section 253(c), indicates that it was intended to force local authorities to charge exactly the same fees and rates, and, in fact, it explicitly rejects that proposition.

Thus, the legislative history underlying section § 253(c) does not support TCG's argument that the City of Dearborn is (or more properly will) violate § 253(c) by imposing comparable, but not identical agreements, on different providers. The legislative history clearly allows the City to account for the differences between providers and it is enough that the City imposes (or plans to impose) comparable burdens. Accordingly, the Court finds no support for TCG's claim that the City, by imposing comparable but

not identical agreements, is, or will be, discriminating against it in violation of § 253(c).

### 3. Prohibiting Entry

■ Plaintiff's last argument under § 253 is that the City of Dearborn, by attempting to impose the agreement at issue is prohibiting its entry into the market in violation of § 253(a). However, as addressed above, because the Court finds the City's regulation neither discriminatory nor unreasonable, it follows that the regulation does not prohibit its entry into the market. The City is not prohibiting the TCG from entry, rather, TCG has chosen not to pay for its access. Thus, the Court finds no violation of § 253(a).

### 4. 42 U.S.C. § 1983

■ Lastly, Count III of TCG's complaint alleges a claim under § 1983. In order to bring a § 1983 action, TCG must establish that (1) the conduct complained of was committed by a person acting under color of state law; and (2) that this conduct derived a person of rights, privileges or immunities under the Constitution or laws of the United States. *Brock v. McWherter*, 94 F.3d 242, 244 (6th Cir.1996). A municipal corporation is a person within the meaning of 42 U.S.C. § 1983. *Monell v. New York Dep't of Social Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

The basis of TCG's § 1983 cause of action is premised upon the alleged violations of 47 U.S.C. § 253(a)and(c)(*See* TCG's summary judgment brief pgs. 18–19, and reply brief pg. 5). Because the Court has held that 47 U.S.C. § 253 is not violated by the City's action, it follows that there is no violation under § 1983, and the claim will be dismissed.

### 5. Conclusion

In sum, based on the foregoing analysis, the Court finds no genuine issue of material fact upon which a reasonable jury could find that the City's ordinance, and the franchise agreement it seeks TCG to enter into, is a violation of 47 U.S.C. § 253. Therefore,

TCG's motion for summary judgment is denied and the City of Dearborn's motion is granted.

### B. City of Dearborn v. Ameritech

■ As discussed above, the original Plaintiff, TCG, brought suit against the City of Dearborn alleging that Dearborn's ordinance requiring it to enter into a franchise agreement was discriminatory under 47 U.S.C. § 253. Prior to the institution of TCG's lawsuit, the City of Dearborn had not sought to impose a franchise agreement upon the incumbent local carrier, Ameritech Michigan (hereinafter "Ameritech"), which was already using the City's right-of-ways. Subsequent to TCG's lawsuit, the City of Dearborn sought to have Ameritech ·enter into a franchise agreement. Ameritech refused on the grounds that it was granted a state wide franchise to operate by virtue of its incorporation, in 1904, pursuant to Public Act 129 of 1883.[2] Thereafter, the City of Dearborn filed a third-party complaint against Ameritech, the third-party defendant. Because the Federal Telecommunications Act allows the City to charge fair and reasonable compensation for use of its right-of-ways, the City alleges that Ameritech, already occupying the City's right-of-ways, must enter into a franchise agreement with the City pursuant to its ordinance.

Both Ameritech and the City of Dearborn have filed motions for summary judgment pursuant to Fed.R.Civ.P. 56. Each have responded and replied. For the reasons that follow, third-party Plaintiff's, City of Dearborn, motion is denied and third-party Defendant's, Ameritech, motion is granted.

Ameritech contends that Dearborn's ordinance requiring a franchise is not applicable to it because Ameritech has a statewide, legislatively granted franchise to operate throughout Michigan. Ameritech contends, and the Court agrees, that it derives its authority to operate throughout Michigan from the statute under which it is organized. Specifically, Section 4 of Public Act 129, en-

---

**2.** In January, 1904, Ameritech Michigan, originally named the Michigan State Telephone Company, and later named the Michigan Bell Tele-

phone Company, incorporated under Michigan Public Act 129 of 1883 (Third-party Defendant's Ex. 8).

acted in 1883 for the organization of telephone and messenger service companies, reads in part:

> Every such corporation shall have power to construct and maintain lines of wires or other material, for use in the transmission of telephonic messages along, over, across, or under any public places, streets, and highways, and across or under any of the waters in this State, with all necessary erections and fixtures therefor: Provided, That the same shall not injuriously interfere with other public uses of the said places, streets, and highways, and the navigation of said waters; to construct, provide, and furnish instruments, devices, and facilitates for use in the transmission of such messages, and to construct, maintain, and operate telephone exchanges and stations, and generally to conduct and carry on the business of providing and supervising communication by telephone, and also the business of furnishing messenger service in cities and towns.

Public Act 129, 1883.

Thus, pursuant to Act 129, a corporation organized under the Act was given the right to conduct and carry on telecommunications business and to construct and maintain lines "along, over, across, or under *any* public places streets, and highways" in the State. *Id.* There was no limitation placed on a company, incorporated under Act 129, subjecting it to local municipality franchise authority. The only limitation was that a municipality could regulate to protect the general welfare.

This interpretation of the Act was explicitly brought forward in *Michigan Telephone Co. v. City of Benton,* 121 Mich. 512, 80 N.W. 386 (1899). In that case, the Michigan Telephone Company brought suit when the City of Benton Harbor attempted to limit its ability to establish a telephone system in the City. The Michigan Supreme Court stated:

> It will be observed that the act under which complainant is organized [Act 129] does not require the consent of the municipality to the construction of its lines.

> \*　　\*　　\*　　\*　　\*　　\*

> Evidently it was not the intention of the legislature to permit municipalities to prevent telegraph and telephone companies from extending their business along the public highways and streets of the state.... *Under this statute the sole authority of the municipality is the proper exercise of the police power, inherent in it, to protect the public from unnecessary obstructions, inconvenience, and dangers, and to determine where and in what manner complainant may erect its poles and stretch its wires so as to accomplish this result. It has no authority to impose other conditions.* That authority rests in the legislature,—the charter—making power.

*Id.* at 516–17, 80 N.W. 386 (emphasis added).

Thus, as can be clearly seen from the statute and the above cited case, Ameritech was granted a statewide franchise to operate its telecommunications system. Under the act which Ameritech is organized, Act 129, the City of Dearborn may manage its public rights-of-way, but, as it relates to Ameritech, *only* to protect the health, welfare, and safety of the public. *Id.* But it may not seek to impose franchise fees.

Therefore, Michigan's Act 129 conferred upon those providers that incorporated thereunder the right to operate in municipalities regardless of their consent, subject only to regulation regarding the health, safety, welfare of the public. *Id.* The City of Dearborn argues, however, that when Michigan revised its Constitution in 1908, which became effective in 1909, and expanded municipality control over streets and highways, this revoked the previous unqualified right of corporations organized under Act 129 to freely operate within the municipalities.

Article VIII, § 28 of the Michigan Constitution of 1908, provided as follows:

> No person, partnership, association or corporation operating a public utility shall have the right to use of the highways, streets, alleys or other public places of any city, village or township for wires, poles, pipes, tracks or conduits, without the consent of the duly constituted authorities of such city, village or township; nor to transact a local business therein without first obtaining a franchise therefor from such city, village or township. The right of all cities, villages and townships to the

reasonable control of their streets, alleys and public places is hereby reserved to such cities, villages and townships.

The Constitution of 1963, Art. VII, § 29, retained the foregoing provision in all pertinent respects. Thus, the State of Michigan, in the 1908 revised Constitution, required those businesses seeking to use a municipalities right-of-ways to first obtain the consent of the municipalities. Thus, according to the City, the 1908 Constitution revoked the previous unlimited grant that Ameritech enjoyed for being organized under Act 129 and it is therefore now subject to the City's franchise requirement.

Ameritech contends that the Constitution of 1908, while allowing municipalities greater control over access to their streets and highways, only applied so long as the business did not already enjoy state-wide franchise rights pursuant to a statute enacted prior to the new Constitution. Thus, according to Ameritech, because it was organized in 1904 under Act 129, the Constitution of 1908 did not alter its existing franchise rights. The Court agrees with Ameritech.

The question of whether or not the 1908 Constitution affected previously organized companies under Act 129 has not been directly reached by the courts of Michigan. However, the Michigan Supreme Court has addressed the same issue in regards to utility companies organized under a statute analogous to Act 129, specifically Act 264 of 1905. The Court believes that Michigan Supreme Court's treatment of Act 264 is a persuasive indicator of how it would address the issue presented concerning Act 129.

Act 264 of 1905 provided for the organization of utility companies. Act 264 is substantially similar to Act 129 which applied to telephone companies. Act 264 provided in part:

Any person, firm, or corporation authorized by the laws of this state to conduct the business of producing and supplying electricity for purposes of lighting, heating and power, and which shall be engaged or which shall hereafter desire to engage in the business of the transmission of such electricity, shall have the right to construct and maintain lines of poles and wires for use in the transmission and distribution of electricity on, along or across any public streets, alleys and highways and over, under or across any of the waters of this state, and to construct and maintain in any such public streets, alleys or highways all such erections and appliances as shall be necessary to transform, convert and apply such electricity to the purposes of lighting, heating and power, and to distribute and deliver the same to the persons, firms and public or private corporations using the same.

Public Act 264 of 1905.

In the case of *City of Lansing v. Michigan Power Co.*, 183 Mich. 400, 150 N.W. 250 (1914), the City of Lansing sued the Michigan Power Company, which had incorporated pursuant to Act 264, and prior to the revised Constitution of 1908. The City of Lansing argued that Michigan Power's right to operate within its borders without regulation by the City was revoked by the 1908 Constitution. The Michigan Supreme Court disagreed and stated:

The act [264] of 1905 tendered a franchise to defendant; such franchise was accepted by defendant by way of installing its service equipment in the public streets and providing a service of a public utility; and this tender and acceptance constitute a contract between the state and defendant beyond the power of the Legislature, the Constitution, or of this court to impair by destroying the contract right to remain in the streets.

*Id.* at 410–411, 150 N.W. 250.

Therefore, according to the Michigan Supreme Court:

The Constitution of 1909 did not revoke and terminate existing use of the streets under Act 264 of 1905. The Constitution did abrogate the law of 1905, but it did not and could not revoke existing contracts under that act arising out of beneficial user of the streets for public utility purposes. Constitutional provisions, as well as legislative enactments, must be held prospective in operation only, unless they carry

upon their face an intention to be retrospective.

*Id.* at 409, 150 N.W. 250.

In 1941, the Michigan Supreme Court reaffirmed the holding from *Michigan Power* in *Village of Constantine v. Michigan Gas & Electric Co.*, 296 Mich. 719, 296 N.W. 847 (1941). In *Constantine*, the Court again stated that the 1908 Constitution did not affect the statewide franchise rights granted to corporations organized under Act 264. *Id.* at 732, 296 N.W. 847. Moreover, the Court held that the term of the franchise was measured by the life of the corporation. *Id.*

Further, in *Traverse City v. Consumers Power Co.*, 340 Mich. 85, 64 N.W.2d 894 (1954), the Michigan Supreme Court held that the geographical limits of a corporation organized under Act 264 were not limited solely to the area serviced by the corporation as of January 1, 1909, the effective date of the 1908 Constitution. The Court stated:

> The effect of such a holding, freezing the rights acquired under the State franchise to the existing user as of 1909, the effective date of the constitutional provision which abrogated the act of 1905[264], is incongruous and detrimental to the public interest.... To hold now that they are restricted from rendering electrical service to an area not previously served within the corporate limits of a growing municipality would thwart the very nature and object of a public utility.

*Id.* at 97, 64 N.W.2d 894.

While Ameritech was formed under Act 129, not Act 264, the statutes are the same in all substantive respects. Each was enacted prior to the adoption of the 1908 Constitution and each statute granted certain corporations the right to use of city streets and rights-of-ways for the operation of their businesses, subject only to regulation by local authority for the health and safety of the public. The Court finds Michigan Supreme Court's analysis of Act 264 persuasive and sufficiently analogous to the issues presented in this case concerning a telephone corporation, such as Ameritech, organized under Act 129.

There is additional support for extending the reasoning applied by the Michigan Supreme Court relating to Act 264 cases to the present situation under Act 129. In 1957, Michigan's Attorney General issued an opinion concerning the Village of Roseville's right to impose fees on certain public utilities, namely Consumers Power, Detroit Edison, and Ameritech (Michigan Bell Telephone Company), based on use of the public places and rights-of-way. The Attorney General found that Roseville could not impose such fees on Ameritech because the fees amounted to a franchise requirement when Ameritech Michigan already had a state franchise:

> Concerning the Michigan Bell Telephone Company, we find that it has never obtained a franchise from the Village of Roseville but relies upon the provisions of P.A. 1883, No. 129, § 4, for its authority to operate in the village. Under this act, statewide franchise rights were granted to telephone companies. The similarity between this statute (P.A. 1883, No. 129) and P.A.1905, No. 264, makes it probable that the decisions of our Court with reference to the 1905 Act would be applicable to rights achieved under the Act of 1883, regardless of latter requirements of the Constitution of 1908. We therefore are of the opinion that the Michigan Bell Telephone Company presently has a valid franchise in the village of Roseville, and its facilities therein may not be subjected to the proposed levy.

Report of the Attorney General, No. 2739 (March 13, 1957).

Therefore, applying the above line of cases by the Michigan Supreme Court interpreting Act 264 to the issue in this case, the Court concludes Ameritech, organized under Act 129, was granted a state-wide franchise to operate. That franchise is not limited solely to those geographical areas serviced by it in 1908. Moreover, the subsequent adoption of the 1908 Constitution did not affect Ameritech's rights or revoke the franchise gained by incorporating under Act 129. *City of Lansing v. Michigan Power Co.*, 183 Mich. 400, 150 N.W. 250 (1914); *Village of Constantine v. Michigan Gas & Electric Co.*, 296 Mich. 719, 296 N.W. 847 (1941); *Traverse City v. Consumers Power Co.*, 340 Mich. 85, 64 N.W.2d 894 (1954). Therefore, the City of

Dearborn cannot require Ameritech to enter into a franchise agreement and its ordinance is inapplicable to it.

In sum, the Court finds as a matter of law that Ameritech has vested state franchise rights which were not abrogated by the revised 1908 Constitution. Accordingly, no genuine issue of material fact remains upon which a reasonable jury could find Ameritech is required to enter into a franchise agreement with the City of Dearborn pursuant to its regulatory ordinance. Therefore, summary judgment in favor of Ameritech, the third-party Defendant is proper.

### V. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Plaintiff's, TCG Detroit, motion for summary judgment is DENIED, Defendant's, City of Dearborn, motion for summary judgment is GRANTED. IT IS FURTHER ORDERED that Third-party Plaintiff's, City of Dearborn, motion for summary judgment is DENIED. Third-party Defendant's, Ameritech, motion for summary judgment is GRANTED. The case is DISMISSED. The Clerk of the Court shall close the case.

IT IS SO ORDERED.

### JUDGMENT

IT IS ORDERED AND ADJUDGED that pursuant to this Court's Order dated August 14, 1998, Plaintiff, TCG Detroit's, and Third–Party Plaintiff, City of Dearborn's, case is DISMISSED.