256 F.Supp.2d 987 (2003)
XO MISSOURI, INC. and Southwestern Bell Telephone Company, Plaintiffs,
v.
CITY OF MARYLAND HEIGHTS, Defendant.
No. 99-CV-1052.
United States District Court, E.D. Missouri, Eastern Division.
February 5, 2003.
*989 William L. Davis, Moser and Marsalek, P.C., St. Louis, Howard J. Symons, William A. Davis, Tara M. Corvo, Amy L. Bushyeager, Mintz and Levin, Washington, DC, Daniel Gonzalez, Theodore S. O'Neal, Nextlink Illinois, Oak Brook, IL, Renardo L. Hicks, Harrisburg, PA, Suzanne L. Montgomery, Thompson Coburn, James W. Erwin, Stephen B. Higgins, Thompson Coburn, John F. Medler, Jr., Southwestern Bell Telephone L.P., St. Louis, for XO Missouri, Inc., Southwestern Bell Telephone Company, plaintiffs.
Howard Paperner, Devoto Law Offices, R. Henry Branom, Jr., R. Henry Branom Jr., P.C., St. Louis, for Maryland Heights, City of, defendant.

MEMORANDUM AND ORDER
JACKSON, District Judge.
Plaintiffs Southwestern Bell Telephone Company ("SWBT") and XO Missouri, Inc. *990 ("XO") bring this action against the City of Maryland Heights, Missouri (the "City") seeking a declaration that Ordinance No.XXXX-XXXX (the "Ordinance") is in violation of the Federal Telecommunications Act of 1996 (the "FTA"), 47 U.S.C. 253(a), (c). This matter is before the Court on plaintiffs' motions for summary judgment. See Fed.R.Civ.P. 56(c). Defendant opposes the motions, and the issues have been fully briefed.

I. Background

On December 7, 2000, the City Council of Maryland Heights adopted the Ordinance. The Ordinance requires providers of communications services:
1) to pay "an annual license fee" equal to the greater of the "per lineal foot fee established from time to time by the City in an annual fee schedule OR five per cent of [the provider of communications service's] gross revenues from the provision for hire of telecommunications services and facilities in the public rights-of-way," where "gross revenues" is defined to include revenues derived "directly or indirectly" by the "Licensee, its affiliates, subsidiaries, parent companies, Lessees, and from any person in whom the Licensee has a financial interest" from the provision of telecommunications services originating or terminating at any location in the City via public right-of-way, see, §§ 4.7(1),(2);
2) to pay an "application fee" of an amount to be fixed by the City Administrator to apply for a "license" to use the public right-of-way, see § 4.5(3);
3) to enter into a "license agreement" with the City, see, § 4.2;
4) to permit City employees to order a provider of telecommunications services to remove facilities from the right-of-way at its own expense and to seize, remove, disable or destroy a provider's facilities in the right-of-way if the City believes that there has been a material violation of the Ordinance, see § 1.12(4)(c).
In addition, the Ordinance imposes the following requirements on providers of telecommunications services, without limitation or qualification:
1) to "register" with the City before installing, repairing or operating a communications facility within the City right-of-way, see § 1.6;
2) to obtain "authorization" from the City before installing, repairing, or operating a communications facility within the City right-of-way, see §§ 1.7, 1.8;
3) to furnish to the City maps showing the precise location of all existing facilities within the City right-of-way and to make those proprietary maps available to the City, where they will be able to be obtained by competitors under Missouri's "Sunshine" laws, see § 1.10(1);
4) to pay monetary penalties for ordinance violations, see § 1.12(2);
5) to indemnify and defend the City against lawsuits and judgments relating in any way to communications facilities within the right-of-way, see § 1.18(1);
6) as a condition to using any City right-of-way, to obtain a Commercial General Liability policy of insurance in the amount of Two Million Dollars with a One Million Dollar umbrella policy, see § 1.18;
7) to fill out a detailed application for a license by, inter alia, listing its qualifications to be a telecommunications provider, see 4.5(6)(a); and

*991 8) to allow the City to co-locate its own proprietary facilities on a telecommunication provider's poles or conduits, see § 4.6(1).
On December 7, 2000, the City Council of Maryland Heights adopted Resolution No. 2000-631 (the "Resolution"), fixing the amount of the per lineal foot fee imposed by § 4.7 of the Ordinance and the manner in which the fee is to be calculated:
For each cable up to four inches in diameter placed in the rights-of-way of the City, an entity must pay $1.74 per lineal foot. For each cable over four inches in diameter placed in the rights-of-way of the City, an entity must pay $.14 per square inch of cross-sectional area per lineal foot. See § B(1).
Plaintiffs argue that the Ordinance should be invalidated in its entirety because it seeks to impose "onerous and burdensome regulations and significant fees on all telecommunications companies in violation of the FTA." Furthermore, plaintiffs assert that "the breadth and extent of the unlawful requirements and fees imposed by the Ordinance are so extensive that they cannot be severed from the remaining portions of the Ordinance."

II. Legal Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Fed.R.Civ.P. 56(c). Once the moving party has met its burden, the non-moving party may not rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corporation v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

III. Discussion

The FTA was enacted to promote competition among, and reduce regulation of, telecommunications providers. 47 U.S.C. § 253; H.R.Rep. No. 104-458 (1996). Toward that end, the FTA prohibits state and local governments from creating "barriers to entry," legal requirements that prohibit or have the effect of prohibiting a company from providing telecommunication service. 47 U.S.C. § 253.
In relevant part, § 253 provides:

Removal of barriers to entry.

(a) In general
No state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

*992 (b) State regulatory authority
Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority
Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.
While § 253 begins with a broad prohibition against state and local regulation, it goes on to enumerate certain narrow exceptions to the broad prohibition, thus leaving a "safe harbor" for limited local regulations.
When evaluating an ordinance in the context of § 253, the first inquiry is whether the challenged ordinance "prohibit[s] or [has] the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." As the court wrote in Qwest Corporation v. City of Portland, "Even if local requirements do not expressly prohibit a telecommunications service, the requirements might be so burdensome that they effectively achieve the same result." 200 F.Supp.2d 1250, 1255 (D.Or. 2002).
The Ordinance at issue here requires all telecommunications companies with facilities in the public rights-of-way to pay an "annual license fee" equal to the greater of a "per lineal foot fee" or 5% of the gross revenues of a provider of telecommunications services. See Ordinance, § 4.7(1), (2). The Ordinance further requires a provider to pay an undisclosed application fee and to enter into a license agreement. Additionally, it authorizes the City to order a provider to remove its facilities from the right-of-way at the provider's expense, and it allows the City to seize, remove, disable, or destroy a provider's facilities in the right-of-way if the City believes that there has been a material violation of the Ordinance. Id. §§ 4.5(3), 4.2, 1.12(4)(c).
The Ordinance also requires a provider to "register" with and obtain "authorization" from the City before installing, repairing, or operating its telecommunications system. The terms "register" and "authorization" are without limitation or qualification. It further requires a provider to furnish maps of the location of all its facilities in a format designated by the City Engineer, to fill out a detailed license application, and to allow the City to co-locate its facilities in a provider's underground conduits. Id. §§ 1.6-1.8, 1.10(1), 4.5(6)(a), 4.6(1). Monetary penalties are authorized for Ordinance violations, and a provider must indemnify and defend the City against lawsuits and judgments relating in any way to communications facilities within the right-of-way. Id. §§ 1.12(2), 1.18(1). In light of the foregoing, it is clear that the Ordinance at issue contains a number of provisions that, in combination, have the effect of prohibiting a company's ability to provide telecommunications services under 47 U.S.C. § 253(a).[1]

*993 A. Gross Revenue and Per Lineal Foot Fees
Plaintiffs argue that the Ordinance is invalid because the FTA restricts a municipality's ability to impose fees on telecommunications carriers to the recovery of actual costs incurred in managing the public rights-of-way. Plaintiffs contend that the gross revenue and per lineal foot fees included in the Ordinance are in no way related to the City's actual costs of maintaining the rights-of-way and they are, therefore, invalid as a matter of law.
Under § 253(c), municipalities may "require fair and reasonable compensation from telecommunications providers ... for use of public rights-of-way." Thus, the question is whether the gross revenue fee and the per lineal foot fee are fair and reasonable compensation.
The City argues that the gross revenue fee is fair and reasonable because it was adopted from the gross revenue fee authorized by a federal statute for cable companies. However, a fee under the FTA is not necessarily "fair and reasonable" simply because it was authorized by a statute unrelated to the FTA. Defendant also argues that the per lineal foot fee is fair and reasonable because it was based upon the charges imposed by the City of St. Louis. Thus, defendant argues that the $1.74 per lineal foot fee must be valid because it is "nearly identical" to what plaintiffs currently pay to the City of St. Louis. The flaw in the defendant's argument is, as plaintiffs aptly point out, there can be vast differences between municipalities, even those in the same geographical area, that can impact the costs incurred by the municipality in managing the telecommunications companies' use of rights-of-way. See Deposition of Stephen Rasmussen, former Assistant City Administrator. The variables that can serve to impact costs include the age of the right-of-way, the usage by all utility companies, the access to the right-of-way and the frequency of that access by all utility companies, and the quality of construction of the right-of-way. Id. Furthermore, the $1.74 per lineal foot fee represents a 322% increase in the fee ($.54 per lineal foot) that defendant previously charged. On the basis of the information before it the Court cannot conclude that the City's per lineal foot feet is presumptively fair and reasonable.
Several courts have held that fees charged by a municipality must be directly related to a company's use of the local rights-of-way, otherwise the fees constitute an unlawful economic barrier to entry under § 253(a). See AT & T Communications of the Southwest, Inc. v. City of Dallas, 8 F.Supp.2d 582, 593 (N.D.Tex. 1998); Bell Atlantic-Maryland, 49 F.Supp.2d at 817. Other courts have held that revenue-based fees are not "fair and reasonable compensation" under the FTA. New Jersey Payphone Association, Inc. v. Town of West New York, 130 F.Supp.2d 631, 638 (D.N.J. 2001) (revenue-based fee can never be sufficiently connected to compensation for use of the rights-of-way); *994 Peco Energy Co. v. Township Of Haverford, No. Civ. A. 99-4766, 1999 WL 1240941 at *8 (E.D.Pa. Dec.20, 1999) (revenue based fees cannot, by definition, be based on pure compensation for use of the rights-of-way). Furthermore, the Federal Communications Commission, the agency charged with administering the FTA, has also determined that fees that are not related to the costs incurred by the local government are prohibited by the FTA. See Memorandum Opinion & Order, In re New England Public Communications Petition for Preemption, 1996 WL 709132, 11 F.C.C.R. 19, 713, 19, 721-22 (F.C.C. 1996). Under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-14, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Court must give deference to the agency's opinion. See also, AT & T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 397, 119 S.Ct. 721, 142 L.Ed.2d 835 (1997) (deferring to FCC to interpret ambiguities in the FTA).
The Court adopts the reasoning supporting other courts' decisions that revenue-based fees are impermissible under the FTA. Thus, to meet the definition of "fair and reasonable compensation" a fee charged by a municipality must be directly related to the actual costs incurred by the municipality when a telecommunications provider makes use of the rights-of-way. In reaching this conclusion, the Court is persuaded by the legislative history of the FTA, as outlined in Bell Atlantic-Maryland, 49 F.Supp.2d at 817 n. 26, as well as the de-regulation concept in the FTA as a whole, since plainly a fee that does more than make a municipality whole is not compensatory in the literal sense, and instead risks becoming an economic barrier to entry. See, e.g., Reno v. ACLU, 521 U.S. 844, 117 S.Ct. 2329, 2337-2338, 138 L.Ed.2d 874 (1997) (stating that the FTA's primary purpose was to reduce regulation and encourage the rapid deployment of new telecommunications technologies).
The legislative history of the FTA reveals that Congress expressly rejected a parity provision that would have required a single fee to be imposed on all carriers in a given area, because a parity requirement would ignore the different amounts of city rights-of-way each carrier used to provide its services. See Bell Atlantic-Maryland, 49 F.Supp.2d at 817 n. 26. Furthermore, in the only Congressional floor argument to address the cost provisions of the FTA, Senator Diane Feinstein explained that telecommunications companies should only be required to pay their share of fees to enable local governments to recover the increased street repair and paving costs that result from repeated excavations of the rights-of-way. See In re Classic Telephone, Inc., 11 F.C.C.R. 13,082 (F.C.C. 1996) citing 141 Cong.Rec. S8172 (daily ed. June 12, 1995), quoted in TCG New York, Inc. v. City of White Plains, 125 F.Supp.2d 81, 90 (S.D.N.Y. 2000). Thus, there is support for the holding that any type of revenue-based fee is invalid under the FTA and any "fair and reasonable compensation" charged by a municipality must be directly related to the actual costs incurred by a municipality when a telecommunications provider makes use of the rights-of-way.[2]
*995 There is evidentiary support for plaintiffs' assertion that the fees at issue here have no relation to the City's costs in managing and maintaining its rights-of-way. Deposition testimony[3] and City's Supplemental Response to SWBT's First Set of Interrogatories show that the City has never conducted a study to specifically determine the costs it incurs which relate to maintaining, inspecting, or managing the public rights-of-way.
Under the FTA, the municipality must show that the fees it seeks are both fair and reasonable. The Court finds that the defendant in this case has not made such a showing. Further, for the reasons discussed above, the Court finds that the plaintiffs have established that the gross revenue and per lineal foot fees are not related to any cost-study or actual costs of the City of Maryland Heights in maintaining its rights-of-way. Thus, the gross revenue and per lineal foot fees are invalid under the FTA.
Plaintiffs next argue that several provisions of the Ordinance are not legitimately related to the City's management of its public rights-of-way and are therefore invalid under the FTA, § 253(c). Before the Court addresses the separate provisions of the Ordinance that plaintiffs argue are invalid, the Court will first address the phrase "management of rights-of-way."
Section 253(c) permits local regulations that "manage the public rights-of-way." The FTA does not define "management of the public rights-of-way," but as discussed above, a number of federal courts have relied on the FCC for interpretive assistance. The FCC has explained that right of-way management means control over the right-of-way itself, not control over companies with facilities in the right-of-way:
[S]ection 253(c) preserves the authority of state and local governments to manage public rights-of-way. Local governments must be allowed to perform the range of vital tasks necessary to preserve the physical integrity of the streets and highways, to control the orderly flow of vehicles and pedestrians, to manage gas, water, cable, (both electric and cable television), and telephone facilities that crisscross the streets and public rights-of-way ... [T]he types of activities that fall within the sphere of appropriate rights-of-way management.. .include coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcement of building codes, and keeping track of the various systems using the rights-of-way to prevent interference between them.
In re TCI Cablevision of Oakland County, Inc., 12 F.C.C.R. 21,396 (F.C.C. 1997) quoted in City of Auburn v. Qwest Corporation, 260 F.3d 1160, 1177 (9th Cir. 2001).
Senator Diane Feinstein, during the floor debate on § 253(c), offered examples of the types of restrictions that the Congress intended to permit under § 253(c), including requirements that:
1) regulate the time or location of excavation to preserve effective traffic flow, prevent hazardous road conditions, or minimize notice impacts;

*996 2) require a company to place its facilities underground rather than overhead, consistent with the requirements imposed on other utility companies;
3) require a company to pay fees to recover an appropriate share of the increased street repair and paving costs that result from repeated excavation;
4) enforce local zoning regulations;
5) require a company to indemnify the City against any claims of injury arising from the company's excavation.
See In re Classic Telephone, Inc., 11 F.C.C.R. 13,082 (F.C.C. 1996) citing 141 Cong.Rec. S8172 (daily ed. June 12, 1995), quoted in City of Auburn, 260 F.3d at 1177, 1178. The Court will now apply the aforementioned guidelines to the specific provisions of the Ordinance at issue.

B. Denial of Access to Right-of-Way
Section 4.5(6)(f) of the Ordinance provides that when evaluating applications for licenses, the City Administrator must consider "such other factors as the City administrator may deem relevant." Plaintiffs argue that this provision violates the FTA because it gives the City virtually unfettered discretion to deny them access to the rights-of-way for their telecommunications facilities.
An onerous application process that is subject to local government decision making has been held to prohibit the provision of telecommunications services. Bell Atlantic-Maryland, 49 F.Supp.2d at 814 ("[A]ny process for entry that imposes burdensome requirements on telecommunications companies and vests significant discretion in local governmental decision makers to grant or deny permission to use public rights-of-way may ... have the effect of prohibiting the provision of telecommunications services in violation of the [FTA].") Furthermore, the Court believes that the terms of an application process must be limited to the types of activities described by the FCC in TCI Cablevision and Classic Telephone, and there appears to be no justification for giving discretion to local decisionmakers to grant or deny an application for a license unless that discretion falls within the confines of the types of allowable restrictions enumerated by Senator Feinstein and the FCC. Thus, a local government's decision to grant or deny an application for a license to provide telecommunications services within that area should not be left to the ultimate discretion of a local official, such as a city administrator. Rather, it may be conditioned only upon a telecommunications company's agreement to comply with the local government's reasonable regulations for managing the use of its rights-of-way. See BellSouth Telecommunications, Inc. v. City of Coral Springs, 42 F.Supp.2d 1304, 1306 (S.D.Fla. 1999); City of Dallas, 8 F.Supp.2d at 592-593; Bell Atlantic-Maryland 49 F.Supp.2d at 816. Thus, § 4.5(6)(f) is invalid under the FTA.
Plaintiffs also challenge § 4.5(6)(a) which permits the City to deny a provider's application for a license based in part on an inquiry into the provider's "technical, financial, and legal qualifications to construct and operate a telecommunications system." Courts have routinely rejected provisions like this, and have held that a city may not use its right-of-way authority to seize general regulatory control over providers. See, e.g., City of Auburn, 260 F.3d at 1178 (A "carrier's financial, technical and legal qualifications to provide service are not relevant to a city's management of its public rights-of-way."); City of Dallas, 8 F.Supp.2d at 592 ("Dallas also does not have the power to require a comprehensive application and consider such factors as the company's technical and organizational qualifications to offer *997 telecommunications services."). Thus, this provision of the Ordinance is also invalid under the FTA.

C. Detailed Written Reports
Plaintiffs next argue that the written reports provisions of the Ordinance must also be declared invalid because they, too, are prohibited by the FTA.
Section 1.10 of the Ordinance requires a telecommunications company to provide "copies of any records of [the company] upon City's request," "so long as said information is directly or indirectly related to the scope of City's rights under this Ordinance, the License or City's regulatory functions." Under this section of the Ordinance, a telecommunications company must retain all records for five years in order to allow the City to inspect the records at any time. The Ordinance also requires a company to maintain separate financial records pertaining to its operations in Maryland Heights. It further prohibits the companies from refusing to release the records, even though the City itself may be required to release them to the public under the Missouri Open Records Law. See R.S.MO. § 610.010, et seq. There is no apparent link between the records requirements of the Ordinance and the City's management of its rights-of-way. Therefore, because these provisions do not correspond with the types of allowable restrictions enumerated in the legislative history of the FTA and by the FCC, the Court finds that the records provisions found in § 1.10 of the Ordinance are invalid under the FTA.

D. Penalty Provisions of the Ordinance
Plaintiffs next argue that the penalty provisions of the Ordinance are prohibited by the FTA. Section 1.12(4)(c) permits removal of all of a provider's facilities for any "material violation" of the Ordinance, but it fails to define or limit "material violation" beyond saying that it "includes] but is not limited to default as to timely payment of annual fees." Again, there is no question that such a penalty provision effectively prohibits the provision of telecommunications services. See City of Auburn, 260 F.3d at 1176 (ability to revoke franchise and/or remove facilities upon breach constitute the "ultimate cudgel" against carriers and violates the FTA). The Court also finds that such an overbroad and unfettered penalty is not reasonably related to the City's management of its rights-of-way, especially when there is no guidance as to what "material violation" could result in removal of a provider's facilities. Referring again to the examples of types of restrictions enumerated by Senator Feinstein, such a penalty might be valid if a material violation was such that the facilities created hazardous road conditions, created ineffective traffic flow, etc. Because the Ordinance does not limit material violations to those enumerated above, the Court finds that § 1.12(4)(c) is invalid under the FTA.

E. Severability of the Invalid Provisions
Plaintiffs argue that "the few non-challenged provisions of the Maryland Heights Ordinance are so interconnected with the challenged provisions that they cannot be severed from the challenged provisions." Thus, plaintiffs argue that the Court should invalidate the Ordinance in its entirety.
Severability is a matter of state law. Leavitt v. Jane L., 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996). Missouri courts have traditionally used section 1.140 R.S.MO. as the test for severability of an unconstitutional county ordinance provision. See Avanti Petroleum, Inc. v. St. Louis County, 974 S.W.2d 506, 512 (Mo.Ct.App. 1998). Although no case *998 applying this statute to a municipal ordinance has been found, the Court will do so here for lack of a better guideline.
The test, as set forth in Avanti Petroleum, is:
The ordinance is valid, regardless of invalid provisions, unless the Court finds the valid provisions of the [ordinance] are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed [the City] would have enacted the valid provisions without the void one; or unless the Court finds that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent. Id.

The Court found above that several provisions of the City's Ordinance are invalid, notably: (1) §§ 4.7(1) and (2), the sections dealing with the gross revenue and the per lineal foot fees; (2) §§ 4.5(6)(a) and (f) dealing with application procedures for licenses; (3) the records provisions found in § 1.10; and (4) the penalty provisions found in § 1.12(4)(c). The Ordinance is forty-seven pages long, and Title IV is the only section that is entitled "Telecommunications Services." However, the title of that section is somewhat misleading, as there is no doubt that the entire Ordinance applies to the plaintiffs, as shown above by the Court's invalidation of several provisions that lie outside Title IV. Further, it appears that the legislative intent of the Ordinance was to provide the City with "fair and reasonable compensation" for others' use of the City's rights-of-way. This language practically mirrors the language of the FTA; thus, it is reasonable to surmise that the entire Ordinance applies to plaintiffs.
The Court notes that the Ordinance has a severability clause within § 1.21 which states that if any section of the Ordinance is found to be unconstitutional or unlawful, then the remainder of the Ordinance should be construed in a way that will effect the City's purpose. As discussed above, the intent of the Ordinance was to allow the City to recoup "fair and reasonable compensation" for others' use of the rights-of-way. This intent cannot be realized in light of the Court's determination that the compensation provisions within the Ordinance are not fair and reasonable. Furthermore, because the invalidated sections contain a mix of application procedures, approval requirements, financial and operations disclosures, and discretionary clauses and penalty provisions, the Court finds that the remaining, unchallenged provisions of the Ordinance, standing alone, are incomplete and incapable of being executed against telecommunications providers in accordance with the legislative intent. As such, the Court will invalidate the Ordinance in its entirety.
Accordingly,
IT IS HEREBY ORDERED that the motion of plaintiff Southwestern Bell Telephone Company for summary judgment on Count II of its complaint [# 133] is granted.
IT IS FURTHER ORDERED that the motion of plaintiff XO Missouri Inc. for summary judgment on Count I of its complaint [# 132-1] is granted.
NOTES
[1] A number of courts have held that certain requirements imposed by local ordinances constitute a prohibition within the meaning of § 253(a). For example, an onerous application process that is subject to local government decision making has been held to prohibit the provision of telecommunications services. See Bell Atlantic-Maryland v. Prince George's County, 49 F.Supp.2d 805, 814 (D.Md. 1999) ("[A]ny process for entry that imposes burdensome requirements on telecommunications companies and vests significant discretion in local governmental decision makers to grant or deny permission to use public rights-of-way may. . .have the effect of prohibiting the provision of telecommunications services in violation of the [FTA]."); see also City of Auburn v. Qwest Corporation, 260 F.3d 1160, 1176 (9th Cir. 2001) (holding, as part of its finding of prohibition, that requiring companies to submit a lengthy and detailed application form along with maps, corporate policies, etc. effectively acts in combination as a prohibition); TCG New York, Inc. v. City of White Plains, 125 F.Supp.2d 81 (S.D.N.Y. 2000) (regulations coupled with long approval process are a prohibition).
[2] Like the Court in Bell Atlantic-Maryland, this Court respectfully disagrees with the position taken by the district court in TCG Detroit v. City of Dearborn, 16 F.Supp.2d 785 (E.D.Mich. 1998), which upheld a city-imposed telecommunications franchise fee of 4% of the plaintiff's gross revenues, in addition to a one-time payment of $50,000. Id. at 790-791. The court in City of Dearborn construed section 253(c) of the FTA as not "limiting] municipalities to strictly their costs related to telecommunications providers[,] use of their rights-of-ways [sic]." Id. at 789. The Court also disagrees with a similar position taken by the district court in TCG New York, Inc. v. City of White Plains, 125 F.Supp.2d 81 (S.D.N.Y. 2000), which upheld a city-imposed telecommunications fee based on 5% of a provider's gross revenues. In both cases, carriers had begun negotiations with the cities before the enactment of the FTA and had been willing to pay a revenue-based fee. The courts looked to the course of dealings based on facts unique to these long histories of negotiations when they upheld the fee structure. However, the court in City of Dearborn did not address the various reasons intrinsic to the FTA, such as the legislative history noted here, that limit fees to actual costs.
[3] Depositions of Mark Levin, Stephen Rasmussen and Bryan Pearl.