### In re METROMEDIA FIBER NETWORK, INC., et al., Debtors.

Nos. 02–22736 ASH to 02–22742 ASH, 02–22744 ASH, to 02–22746 ASH, 02–22749 ASH, 02–22751 ASH to 02–22754 ASH.

United States Bankruptcy Court, S.D. New York.

June 22, 2004.

---

§ 253(a). The claim in question is based on a 5% "franchise fee" (alternatively referred to as "rent" or a claim based on *quantum meruit*) which, together with other local franchise requirements, is imposed by a county on all telecommunications service providers except for the incumbent provider. Under the analysis of the Court of Appeals for the Second Circuit in *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67 (2d Cir.2002), *cert. denied, City of White Plains v. TCG New York, Inc.*, 538 U.S. 923, 123 S.Ct. 1582, 155 L.Ed.2d 314 (2003) (hereinafter *White Plains*), I conclude that the objection must be sustained and the claim disallowed.

### Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(a) and the standing order of reference of the late Acting Chief Judge Robert J. Ward dated July 10, 1984. This claim objection is a core proceeding under 28 U.S.C. § 157(b).

Kronish, Leib, Weiner & Hellman LLP, By Jeffrey Cohen, Esq., New York City, for Debtors.

Cole, Raywid & Braverman, LLP, By Robert G. Scott, Jr., Esq., Washington, D.C., for Debtors.

Miller & Van Eaton, LLP, By Kenneth A. Brunetti, Esq., San Francisco, CA, for Montgomery County.

### DECISION ON OBJECTIONS TO CLAIMS

ADLAI S. HARDIN, JR., Bankruptcy Judge.

The issue before the Court is whether a claim may be disallowed on the ground that it violates the federal Telecommunications Act of 1996, 47 U.S.C. § 251 *et seq.* (the "FTA"), in particular 47 U.S.C.

### Background

The Debtors Metromedia Fiber Network, Inc., *et al.,* are in the business of providing fiber optic infrastructure, high-bandwidth Internet connectivity and managed Internet infrastructure for customers in the United States and Europe. The Debtors have constructed, maintained and operated a fiber optic network and related facilities throughout the United States. Montgomery County, Maryland ("Montgomery County" or "County"), is a home-rule county with a charter form of government. Its County Commissioners have "power to make all such rules and regulations with reference to the use of the roads, streets, avenues, lanes, alleys and bridges of the county by telephone ... companies." Laws of Maryland 1910, ch. 484, § 177H. Its Board of Commissioners

has "authority to grant ... franchise for such money compensation as it shall upon inquiry determine proper ... for a period not longer than twenty-five years." *Id.* at § 177W.

On or about June 22, 1999, Metromedia Fiber Network Services, Inc. ("MFNS"), one of the Debtors, and Montgomery County entered into a franchise agreement (the "Franchise Agreement") which gave MFNS access to the public right-of-way in Montgomery County to construct, install, operate and maintain fiber optic network facilities. Under the Franchise Agreement, the Debtors are required, *inter alia,* to make a semi-annual payment of 5% of MFNS's adjusted gross revenues (the "5% Franchise Fee").[1] *See* the Franchise Agreement ¶ 4.2. The Franchise Agreement expired by its own terms on June 28, 2001. The Debtors attempted unsuccessfully to enter into a new franchise agreement without the 5% Franchise Fee and certain other requirements.

Verizon–Maryland, Inc., f/k/a Bell Atlantic–Maryland, Inc. ("Verizon"), is the incumbent provider of local exchange telecommunications service in Montgomery County Verizon owns and runs telecommunications operations in Montgomery County, and offers a greater volume of service than any of its competitors in the county. Verizon is exempt from any franchise process or requirement, including the 5% Franchise Fee imposed by Montgomery County on all other providers of telecommunications services in the county.

On or about October 17, 2002 and September 10, 2003, Montgomery County filed multiple claims against the Debtors, asserting an unquantified pre-petition claim and a post-petition administrative claim in the amount of not less than $4,399.76 for the 5% Franchise Fee, "had the Franchise Agreement been in effect." AboveNet, Inc., f/k/a Metromedia Fiber Network, Inc., for itself and on behalf of the reorganized debtors[2] sought entry of an order disallowing and expunging these claims, alleging that the franchise process and requirements violated Section 253 of the FTA.[3] The County objects to such an or-

---

1. The Franchise Agreement also requires the Debtors' (1) to submit financial statements with each payment of franchise fees, "keep accurate books of account" and allow Montgomery County to inspect or audit the Debtors' books of account; (2) to pay "all reasonable expenses relating to the preparation, issuance, implementation and administration of this agreement" up to Two Thousand Dollars ($2,000); (3) to file a cash deposit, surety bond or letter of credit acceptable to Montgomery County for $50,000 as security for the "faithful performance by MFN of the provisions of the Agreement and the Laws"; and (4) to keep insurance policies up to $2 million per occurrence, for general liability, automotive and personal injury. *See* the Franchise Agreement ¶¶ 4.2–4.4, 73, 91.

2. On August 21, 2003, the Second Amended Plan of Reorganization of the Debtors was confirmed by an order of this Court and became effective on September 8, 2003.

3. The Debtors also claim that Montgomery County's unfettered discretion in granting of franchises under its ordinance and redundant franchise process violate Section 253, aside from the fact that franchise process is unfair, unreasonable and discriminatory since Verizon is exempt from such process. Montgomery County Code Section 49–12 provides that absent a "valid objection," the County Council "shall have authority to grant" franchises if such grant "appears to the council...expedient and proper." Montgomery County Code, § 49–12. The Code does not define or explain the phrase "expedient and proper." Such broad language allows the County Council to arbitrarily deny a franchise application so long as it considers that granting the application would not be "expedient and proper." Such arbitrary authority is tantamount to "a right to prohibit providing telecommunications services." *White Plains,* 305 F.3d at 76 (finding the City's right to reject any franchise application on public interest grounds that the City considered "pertinent"

der, arguing, *inter alia,* that the Debtors have failed to make the threshold showing required by Section 253(a).

### Discussion

■ Technological advances enabled competition among local telephone service providers and changed the perception that local telephone service is a "natural monopoly." *AT & T Corporation v. Iowa Utilities Board,* 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). In response to this breakthrough, Congress put an end to the "longstanding regime of state-sanctioned monopolies," by enacting the FTA. *Id.* The FTA "fundamentally restructure[d] local telephone markets[,]" and States and local governments may not "impede competition" by laws any longer. *Id.* Such restriction is embodied in Section 253, entitled "Removal of barriers to entry." 47 U.S.C. § 253. Section 253 provides in relevant part:

(a) In general. No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority. Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscrimina-

---

was equivalent to "a right to prohibit providing telecommunications services").

The franchise application process appears unnecessarily redundant and long. First, the applicants must negotiate franchise agreements with the County Executive representatives. Second, the proposed franchises undergo a public notice period. If there are objections to the applications, public hearings before the County Executive take place. Third, the County Executive refers the franchise applications to County Council with its recommendation either to grant or deny the franchises sought. Fourth, the applicants undertake more negotiations with the County Council. In a public hearing the County Council may refer the franchises requested to the County's Management and Fiscal Policy Committee (the "Committee"). Fifth, the Committee may consider the matter in a workshop open to the public. The Committee in these workshops may demand additional information and subject applicants to further negotiations on provisions of franchise agreements already approved by the County Executive. Sixth, if the Committee is satisfied, it refers franchise agreements to the President of the Council for further public hearings in open Council. Seventh, if the full Council approves the agreements after these hearings, the applicants receive their franchises. William H. MacDonald, Jr. Affidavit in Support of The Reorganized Debtors' Objection to Montgomery County's Claims ¶¶ 16–17. Clearly, during the delay caused by this redundant and long process the Debtors are prohibited from providing its service in Montgomery County. *White Plains,* 305 F.3d at 76 ("the extensive delays in processing TCG's request for a franchise have prohibited TCG from providing service for the duration of the delays"), *see also City of Auburn v. Qwest Corporation,* 260 F.3d 1160, 1176 (9th Cir. 2001) ("regulations coupled with long approval process are a prohibition," citing *TCG New York, Inc. v. City of White Plains,* 125 F.Supp.2d 81 (S.D.N.Y.2000)).

One may wonder why any city or county would impose such burdensome and costly hurdles and delays on commercial entities seeking to provide useful and economic services to its own citizens.

tory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. §§ 253(a)-(c).

While subsection (a) proscribes states and local governments from directly or indirectly prohibiting any provider's ability to provide its service, subsections (b) and (c) allow certain restrictions imposed by states and local governments on telecarriers for uses of the public rights-of-way. *XO Missouri, Inc. v. City of Maryland Heights*, 256 F.Supp.2d 987, 992 (E.D.Mo. 2003) ("While § 253 begins with a broad prohibition against state and local regulation, it goes on to enumerate certain narrow exceptions to the broad prohibition . . ."). In other words, "Section 253 [asserts] that [state or local authorities] must not raise barriers to entry that are discriminatory or not competitively neutral." *City of Rome v. Verizon Communications, Inc.*, 362 F.3d 168, 181 (2d Cir.2004).

■ Faced with similar unequal franchise requirements, the Second Circuit has held that prohibitions violating subsection (a) need not be "complete or 'insurmountable' to run afoul of § 253(a)." *White Plains*, 305 F.3d at 76. In *White Plains*. TCG, a new entrant to the telephone market of the City of White Plains (the "City"), challenged under the FTA Section 253, *inter alia*, the City's ordinance and franchise proposal that all new entrants must comply with, except for the incumbent provider.[4] The Second Circuit held that Section 253 was violated by, *inter alia*, the "extensive delays" in the franchise approval process, the City's right to reject applications on "pertinent" public interest grounds and the disparate imposition of the franchise requirements, particularly the 5% franchise fee based on the applicant's gross revenue derived from the City. *Id.* at 76–80. It held that the delays prohibited the new entrant from providing its service during that delays. *Id.* at 76. It ruled that the right to reject was tantamount to a right to forbid new entrants from "providing telecommunications services." *Id.* With regard to the 5% franchise fee, the Second Circuit gave lengthy explanations as to why it violated Section 253.

The Court first considered whether the fee provision was saved by subsection (c). It reviewed separately the issues of whether the 5% franchise fee fell within the "fair and reasonable compensation" and whether the franchise fee was applied indiscriminately. *Id.* at 77. It declined to contemplate the first issue because its determination was "difficult" and "not necessary" based upon its subsequent analysis of competitive neutrality and nondiscrimination. *Id.* at 79. Then, it probed whether the fee provision was consistent with the competitive neutrality and nondiscrimination requirement under subsection

4. The ordinance required any telecommunications provider using the rights-of-way to obtain a franchise or revocable license from the Common Council. It mandated the franchisees to keep "accurate records." It provided the City a right to review records and facilities. Applicants were required to make disclosures such as description of the services sought to be provided, proposed financing plans for constructing and operating the system, and descriptions of "legal, financial, technical, and other appropriate qualifications of the applicant[s]." The franchise agreements were required to include terms specifying services offered and all additional terms that the City considers "necessary or appropriate in furtherance of the public interest." The proposed franchise agreement required the new entrant to pay 5% of its annual gross revenues earned from White Plains business to the City. It included a "most favored vendee" provision and prohibited the new entrant from transferring the franchise or ownership of more than 20% of the new entrant without prior consent of the City. *White Plains*, 305 F.3d at 72–73.

(c). *Id.* at 79–80. Observing that Verizon, the incumbent provider, was exempt from the provisions of the ordinance and all franchise requirements, it held that "the disparate treatment is plainly not 'competitively neutral and nondiscriminatory.'" *Id.* at 79.

■ Under Section 253, states and local governments may impose fees for use of the public rights-of-way so long as the fees are "fair and reasonable" and applied "on a competitively neutral and nondiscriminatory basis." 47 U.S.C. § 253(c); *White Plains,* 305 F.3d at 77 ("In order for the fee to fall within [subsection (c)], the fee must constitute 'fair and reasonable compensation' and must be applied 'on a nondiscriminatory basis'"); *TC Systems, Inc. v. Town of Colonie,* 263 F.Supp.2d 471, 488 (N.D.N.Y.2003) (same). What is unlawful is the discriminatory application of such fees. "[F]ees that exempt one competitor are inherently not 'competitively neutral'" under Section 253. *White Plains,* 305 F.3d at 80; *Town of Colonie,* 263 F.Supp.2d at 489 (holding franchise requirements imposed on all others save the incumbent provider is clearly not "competitively neutral and nondiscriminatory"). Requiring one provider to pay certain fees not imposed on another gives the latter competitive advantages to "either undercut [the former's] prices or to improve [the latter's] profit margin relative to [the former's] profit margin." *White Plains,* 305 F.3d at 79. The county-sanctioned competitive advantages in the instant case clearly "run directly contrary to the pro-competitive goals of [the FTA]." *Id.* Therefore, the 5% Franchise Fee is invalid under Section 253.

Montgomery County argues that the question of competitive neutrality and non-discrimination arises only under subsection (c), a savings clause which does not create a separate obligation. It asserts that in order to reach subsection (c) the Court must first find that subsection (a) has been violated without regard to the anti-discrimination standards in subsection (c). Subsection (c) is indeed a safe harbor provision allowing states and local governments to place certain requirements on telecommunications service providers' uses of the public rights-of-way. *Id.* at 77; *New Jersey Payphone Association, Inc. v. Town of West New York,* 299 F.3d 235, 240 (3d Cir.2002) (subsections (b) and (c) are considered "savings clauses, excepting the listed local and state functions from the preemptive effect of subpart(a)"); *Town of Colonie,* 263 F.Supp.2d at 480 (stating that subsection (c) is one of the two "safe harbor" provisions); *XO Missouri, Inc.,* 256 F.Supp.2d at 992 (same). But Montgomery County errs in asserting that the "competitive neutrality and nondiscrimination" issue is confined only to subsection (c). In determining whether subsection (a) prohibition occurred, the Second Circuit in *White Plains* "agree[d]" with the approach adopted by the Federal Communications Commission (the "FCC") to "consider[] whether the ordinance *materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment.*" *White Plains,* 305 F.3d at 76 (emphasis added). In the context of the facts here, this Court also agrees with the FCC test and holds that the disparate application of the 5% Franchise Fee clearly "inhibits or limits the ability of [the Debtors] to compete [fairly]." Hence, the 5% Franchise Fee is invalid under subsection (a) and is not saved by subsection (c). *Id.* at 80; *Town of Colonie,* 263 F.Supp.2d at 489.

■ Montgomery County argues that subsection (c) allows for different treatments for comparable telecommunications service providers. It states that Verizon

receives different but comparable treatment according to Verizon's corresponding rights and duties with Montgomery County. It explains that the Verizon arrangement is a *quid pro quo* agreement inherited from its corporate predecessor. Verizon must provide phone service throughout the State of Maryland in exchange for its use of the right-of-way without paying any county franchise fee. It is true that "precise parity of treatment" is not mandated by Section 253. *White Plains*, 305 F.3d at 80. Congress refused to include in the FTA a parity clause [5] requiring a flat fee on all telecommunications service providers in a given location because it was concerned that such provision would disregard the different levels of uses by the providers.*XO Missouri, Inc.*, 256 F.Supp.2d at 994. Hence, "franchise fees need not be equal." *White Plains*, 305 F.3d at 80.

■ However, competitive neutrality of fees for using the public rights-of-way "should be determined based on future costs of providing services, not sunk costs incurred in the past, because that is the playing field on which the competition will take place" *Id.* at 79. Thus, the Verizon scheme is no longer *quid quo pro* because Verizon clearly was "compensated for those sunk costs by receiving a monopoly on phone service within [Montgomery County] under the old system and would normally be expected to have included those costs in its rate base." *Id.* As ex-

pressed by the Second Circuit in *White Plains:* "a municipality may not … impose … compensatory provisions on one service provider without placing any on another… While municipalities may be flexible, the compensation they exact must be 'competitively neutral and nondiscriminatory.'" *Id.* at 80; *see also Town of Colonie*, 263 F.Supp.2d at 489 (same).

■ The Court is mindful of the split among the courts as to the question of whether gross-revenue-based fees constitute "fair and reasonable compensation." *E.g., XO Missouri, Inc.*, 256 F.Supp.2d at 994 ("[R]evenue-based fee[s]" are impermissible under the FTA and "'fair and reasonable compensation' … must be directly related to the actual costs incurred by a municipality …"); *Bell Atlantic–Maryland, Inc. v. Prince George's County*, 49 F.Supp.2d 805, 818 (D.Md.1999) (3% gross revenue fees are not "fair and reasonable" because costs must correspond to the provider's level of uses, not "overall level of profitability"), *vacated on other grounds*, 212 F.3d 863 (4th Cir.2000); *City of Chattanooga v. Bellsouth Telecommunications, Inc.*, 2000 WL 122199, at *4, 2000 Tenn.App. LEXIS 32, at *12–13 (Tenn.Ct. App.2000) ("The proper measure for a franchise fee … is not the 'franchise's value as a business asset', but rather the cost to the City of allowing the franchise to use its public rights-of-way"); *TCG Detroit v. City of Dearborn*, 206 F.3d 618, 621 &

---

**5.** The provision which would have required parity, proposed but rejected by Congress, stated as follows:

Parity of Franchise and Other Charges— Notwithstanding section 2(b), no local government may impose or collect any franchise, license, permit, or right-of-way fee or any assessment, rental, or any other charge or equivalent thereof as a condition for operating in the locality or for obtaining access to, occupying, or crossing public rights-of-way from any provider of tele-

communications services that distinguishes between or among providers of telecommunications services, including the local exchange carrier. For purposes of this subsection, a franchise, license, permit, or right-of-way fee or an assessment, rental, or any other charge or equivalent thereof does not include any imposition of general applicability which does not distinguish between or among providers of telecommunications services, or any tax.

H.R. 1555, 104th Cong. § 243(e) (1995).

624–25 (6th Cir.2000) (4% franchise fees based on gross revenue together with one time payment of $50,000 and administrative expense reimbursement to the city up to $2,500 were "fair and reasonable"). However, this Court need not consider the issue of "fair and reasonable· compensation" because the franchise process and requirements in this case are not "competitively neutral and nondiscriminatory," and are therefore in violation of Section 253.

Montgomery County's reliance on the Sixth Circuit decision in *TCG Detroit*, 206 F.3d 618, is misplaced. The Second Circuit has concluded that *TCG Detroit* was "wrongly decided" because by allowing the City of Dearborn to impose the challenged franchise fees, it permitted Dearborn to provide competitive advantages to the incumbent provider, thereby undermining the goal of the FTA. *White Plains*, 305 F.3d at 79–80. This Court agrees with, and in any event is bound by, the Second Circuit ruling.

### Conclusion

Under the authority of the Second Circuit in *White Plains*, the Court holds that the discriminatory imposition of the 5% Franchise Fee is unlawful and that Montgomery County's claims based thereon must be disallowed.

Counsel for the Debtors are directed to submit promptly an order in conformity with this decision.